1  DAVID G. TORRES-SIEGRIST State Bar No. 220187

2  **TORRES⫴SIEGRIST**

   225 S. Lake Avenue
3  Suite 300
   Pasadena, CA 91101
4  Phone:      (626) 432-5460
5  Facsimile:  (626) 446-8927
   *dgts@icloud.com*
6

7

8  **Attorneys for Plaintiffs, DJCBP CORPORATION DBA**
   **TIER ONE CONSULTING, a California Corporation and**
9  **David Ju, an individual**

10

11            **UNITED STATES DISTRICT COURT**

12                  **CENTRAL DISTRICT**

13

14

| | |
|---|---|
| 15  DJCBP CORPORATION DBA TIER ONE CONSULTING, a California Corporation and David Ju, an individual<br>16<br>17                Plaintiffs,<br>18<br>19            vs.<br>20  CITY OF BALDWIN PARK, a municipality; ROBERT NACIONALES-TAFOYA, an individual; ANTHONY WILLOUGHBY, II, an individual; RICARDO PACHECO, an individual; ISAAC GALVAN, an individual; MANUEL LOZANO, an individual; LOURDES MORALES, an individual and Does 1-50<br><br>                Defendants. | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES**<br>  1. **VIOLATIONS OF RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT [RICO VIOLATIONS BASED ON BRIBERY. KICKBACKS. FRAUD AND CONSPIRACY];**<br>  2. **INVERSE CONDEMNATION/ TAKING (U.S. CONST. 5TH AMEND.);**<br>  3. **VIOLATIONS OF CIVIL RIGHTS [42 U.S.C. § 1983];**<br>  4. **NEGLIGENCE;**<br>  5. **FRAUD;**<br>  6. **DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

28

**INTRODUCTORY STATEMENT**

1. The following lawsuit involves a conspiracy amongst greedy and corrupt City Officials and Politicians from the Cities of Baldwin Park and Compton to utilize the Commercial Cannabis Industry as a vehicle to perform racketeering activities involving bribery, fraud, embezzlement, and abuse of public office.

2. These individuals acted in concert to orchestrate a swindle on an elderly man dying of cancer who poured his lifesavings into a venture that was destined for failure from the get-go and nothing more than a collusive scheme marred by bribery and corruption.

3. At one point, the City of Baldwin Park's own deputy Clerk committed notary fraud by attesting in her official capacity that Plaintiff DAVID JU amongst others, including the City Attorney and Councilmembers, appeared before her to execute a purchased Amended Development Agreement.

4. Unfortunately for the City Clerk, Plaintiff David Ju was not even in the San Gabriel Valley on the day she claims plaintiff executed the agreement in her presence.

5. Ultimately, through the U.S. Attorney's Office's unsealed pleas on October 7, 2022, including the plea of disgraced former Baldwin Park City Councilman Ricardo Pacheco, plaintiffs realized that were sold nothing more than an endless cycle of debt collusively "negotiated" between a current City Attorney and a soon-to-be City Attorney which was destined for failure from the get-go.

**PARTIES**

6. At all times Plaintiff DJCBP CORPORATION DBA TIER ONE CONSULTING, (hereinafter "Plaintiff TIER ONE") is and was a licensed and registered Corporation qualified to do business in the State of California.

7. At all times mentioned herein, Plaintiff DAVID JU, is and was an individual residing in the County of Los Angeles.

8. Defendant CITY OF BALDWIN PARK, (hereinafter "CITY") is and was at all times pertinent hereto, a municipal corporation and political subdivision existing under the laws of the State of California.

9. At all times mentioned herein, Defendant ROBERT NACIONALES-TAFOYA, (herein after "TAFOYA") is and was an individual residing in the County of Los Angeles and was employed in the capacity of CITY ATTORNEY OF BALDWIN PARK during the events and circumstances giving rise to this lawsuit. Defendant is sued in his official capacity, as well as his individual capacity.

10. At all times mentioned herein, Defendant ANTHONY WILLOUGHBY, II, (herein after "WILLOUGHBY, II,") is and was an individual residing in the County of Los Angeles and following the license he sold to Plaintiffs was employed as DEPUTY CITY ATTORNEY OF BALDWIN PARK. Defendant is sued in his official capacity, as well as his individual capacity.

11. At all times mentioned herein, Defendant RICARDO PACHECO (herein after "PACHECO") is and was an individual residing in the County of Los Angeles. PACHECO was a member of the Baldwin Park City Council during the times alleged herein. Defendant is sued in his official capacity, as well as his individual capacity.

12. At all times mentioned herein, Defendant ISAAC GALVAN (herein after "GALVAN") is and was an individual residing in the County of Los Angeles. During the times alleged herein GALVAN was the Mayor of the City of Compton. Defendant is sued in his official capacity, as well as his individual capacity.

13. At all times mentioned herein, Defendant LOURDES MORALES (herein after "MORALES") is and was an individual residing in the County of Los Angeles and was the Deputy City Clerk during the events that give rise to

1  this lawsuit. Defendant is sued in her official capacity, as well as his

2  individual capacity.

3  14. At all times mentioned herein, Defendant MANUEL LOZANO (herein after

4  "LOZANO") is and was an individual residing in the County of Los Angeles.

5  LOZANO was the Mayor of Baldwin Park during the timeframe alleged

6  herein.  Defendant is sued in his official capacity, as well as his individual

7  capacity

8  15. Defendant CITY is liable for the nonfeasance and malfeasance of Defendants

9  TAFOYA, WILLOUGHBY II, PACHECO, LOZANO and MORALES and

10  DOES 1-30 as to Plaintiffs' state law claims pursuant to Cal. Govt. Code §

11  815.2 (a). ("A public entity is liable for injury proximately caused by an act or

12  omission of any employee of the public entity within the scope of his

13  employment if the act or omission would, apart from this section, have given

14  rise to a cause of action against the employee or his personal representative."

15  See also Cal. Govt. Code § 815.6.

16  16. Plaintiffs are ignorant of the true names and capacities of Defendants sued

17  herein as Does 1-50, inclusive, and therefore sue said Defendants by such

18  fictitious names.  Plaintiff will amend its Complaint to allege their true

19  names and capacities when ascertained.  Plaintiff is informed and believes,

20  and based thereon alleges, that each of these fictitiously named Defendants

21  participated or acted in concert with Defendants and is/are responsible in

22  some manner for the acts, occurrences and/or omissions alleged herein and

23  has thereby proximately caused damages to Plaintiff and is liable by reason

24  of the facts alleged herein.

25  17. That at all times herein mentioned, each and every defendant herein was the

26  agent, servant, employee, partner or joint venturer of the other defendants

27  herein; that at all said times, each of said defendants was acting within the

28

THE LAW OFFICES OF
TORRES ‡ SIEGRIST

1  course and scope of said agency, service, employment, partnership and joint

2  venture.

3  ## JURISDICTION AND VENUE

4  18. This civil action is brought to redress alleged deprivations of the Plaintiff's

5  federal constitutional rights protected by 42 U.S.C. §§ 1983 and 1988, the

6  Fifth and Fourteenth Amendments of the United States Constitution,

7  California common law, the California Constitution, and the Unruh Act.

8  19. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

9  20. Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants

10  reside in, and all incidents, events, and occurrences giving rise to this action

11  occurred in Los Angeles County, California.

12  ## TORT CLAIMS COMPLIANCE

13  21. Plaintiffs have complied with the Government Tort Claims Act as required

14  by law with respect to all causes of action brought herein pursuant to state

15  law.

16  ## FACTS COMMON TO ALL CLAIMS

17  22. On July 18, 2018, WILLOUGHBY, II as the "sole owner" of Tier One

18  Consulting was extended a Development Agreement (hereinafter "DA")

19  ratified and approved by the Baldwin Park City Council.  This DA was

20  identified as DA 18-20 as well as Ordinance 1427.

21  23. Furthermore, the CITY codified the WILLOUGHBY II agreement by

22  enacting Ordinance 1427.

23  24. The subject Development Agreement was entered into by and between the

24  City and TIER ONE CONSULTING[1] with the premises located at 14726

25  Arrow Highway (APN: 8414-005-002).

26  ―――――――――――――――

27  [1] It is unclear why or how the City entered into a Development Agreement with an informal entity not registered with the State of California as an LLC, Corp or any other type of business entity.

28

25. On October 25, 2018, WILLOUGHBY, II entered into a purchase agreement with Plaintiff JU to "sell" his development agreement/cannabis license.

26. The sale was brokered by GALVAN, the then Mayor of Compton to which City Attorney TAFOYA had close ties: i.e. Mr. Tafoya's wife worked as an administrative assistant to Mr. Galvan.

27. Not by coincidence, TAFOYA's house and Office were raided simultaneously by the FBI on the same day Federal Agents executed a search warrant on GALVAN'S on November 3, 2020.

28. **ILLEGALITY OF SALE OR CHANGE OF PROPERTY ADDRESS-** At the time of the sale of this cannabis license by Deputy City Attorney Willoughby II to David Ju, Ordinance 1408 constituted the Baldwin Park Commercial Cannabis Ordinance.  This ordinance had been ratified and approved by the City Council on April 4, 2018.

29. Section 127.08 of the Ordinance specifically prohibited the Transfer or Change in Ownership or Location of any commercial cannabis license within the City.

30. Section 127.01 subdivision (v) awkwardly defines "medical cannabis business" as "any person engaged in Commercial Cannabis Activities."

31. However, in direct contravention to 127.08, purportedly on April 3, 2019, the City of Baldwin Park, by and through Defendant LOZANO, ***with absolutely no ratification or input from council***, entered into this sham "Amended" Development Agreement with Plaintiffs.

32. Compounding the collusion to swindle Plaintiffs, Deputy City Clerk Defendant MORALES, "notarized" the execution proclaiming that on April 3, 2019 "Manuel Lozano, Jean M. Ayala, Robert N. Tafoya and David Ju appeared before her and signed the DA.

33. Unfortunately for Defendant MORALES, not only did Plaintiff JU actually receive and execute the DA for the first time in May of 2019, on the date of the

alleged notarization- April 3, 2019- Plaintiff JU was not even in the San Gabriel Valley.

34. Coincidentally, when the notary fraud was brought to light by Plaintiffs' Government Tort Claim, after many years employed by the CITY Defendant MORALES abruptly resigned from her position.

35. Adding fuel to this fire is the fact that WILLOUGHBY, II in cahoots with his soon to be law partner, City Attorney TAFOYA forced plaintiffs to make payments on the License even before the sale of the license was ever fully consummated.

36. Plaintiff JU who had already been locked into escrow on the property the license was to be transferred to, was told by Defendant TAFOYA that if a $50,000.00 mitigation payment was not made, the license would be "canceled."

37. In fact, when reviewing Defendant WILLOUGHBY II's actual payments towards the license/DA, City records reveal that he only was out of pocket less than $4,000.00 at the time he sold the license to plaintiffs for hundreds of thousands of dollars and in fact simultaneously pawned off his debt to plaintiffs under the mitigation fee scheme.

38. Following are the only out-of-pocket transactions paid by Anthony Willoughby before he sold his license to Mr. Ju for hundreds of thousands of dollars.

39. It is important to note that WILLOUGHBY II appears to have also been acting as GALVAN's personal attorney as well as in his stead as a Compton City Council Member during the relevant time periods involving the subject transaction as reflected in recent Fair Political Practices Commission Investigation into GALVAN's nefarious political woes which recently culminated into the levying of a $245,000.00 fine.

COMPLAINT

40. Furthermore, Defendant TAFOYA's connection to Defendant GALVAN and the City of Compton also ran deep.  TAFOYA personally donated thousands of dollars to GALVAN'S political campaigns going back to 2015.

41. Furthering the connection to GALVAN and the City of Compton is that TAFOYA's wife was employed by the City of Compton since at least 2017.

42. On **October 7, 2022,** a plea agreement was unsealed in <u>USA v. Gabriel Chavez</u>, bearing U.S.D.C. Criminal Case No. 2:22-cr-00462-MWF. (<u>See</u> Exhibit A which is incorporated into the Complaint by reference as though fully setforth herein)

43. The following relevant allegations compromise the integrity of the commercial cannabis agreements which apparently were "negotiated" by TAFOYA  (aka person no. 1) and consultants, such as Felon Gabriel Chavez.

44. The plea agreement's factual basis commences on page 9.

```
20    Ricardo Pacheco ("Pacheco") was elected to the City Council for
21  the City of Baldwin Park (the "City") in 1997 and held that position
22  until in or around June 2020.  He also served as the City's Mayor Pro
23  Tempore from in or around December 2017 to December 2018.  In both
24  roles, he was as an agent of the City.
```

45. On page 10, the following portion of the plea identifies Defendant TAFOYA as person no. 1:

```
1    Person 1¹ has served as the Baldwin Park City Attorney since in
2  or around December 2013.
```

///

///

46. On page 11, the plea provides that TAFOYA actually provided to PACHECO "a template for a sham consulting agreement." This portion of the plea also establishes that PACHECO accepted bribes in return for his votes for commercial cannabis development agreements.

> 3     Defendant was asked by Pacheco to act as an intermediary to
> 4  funnel bribes to Pacheco, and defendant agreed. To help conceal the
> 5  bribery scheme, defendant obtained a template for a sham consulting
> 6  agreement from Person 1, which defendant thereafter used to
> 7  facilitate and disguise the scheme. Defendant used his company,
> 8  Market Share Media Agency, to funnel bribe payments to Pacheco from
> 9  two companies, Marijuana Company 3 and Marijuana Company 4. Both
> 10 companies hired defendant to help them obtain marijuana permits, but
> 11 rather than perform legitimate consulting services, defendant
> 12 primarily funneled bribe payments to Pacheco in order to ensure that
> 13 Pacheco and the City Council voted in favor of both companies'
> 14 marijuana permits. Defendant used the template for the sham
> 15 consulting agreement provided by Person 1 for the contracts with
> 16 Marijuana Company 3 and Consulting Company 3, which represented
> 17 Marijuana Company 4.

47. The collusion between GALVAN (Person No. 10) and TAFOYA (No.1) was made crystal clear on Page 13 of the plea.

> 13    In Fall 2017, Marijuana Company 3 appeared on a draft agenda
> 14 of the regular City Council meeting, but when the final agenda
> 15 posted, Marijuana Company 3 was no longer listed on it. Around this
> 16 same time, defendant learned from Marijuana Company 3's
> 17 representatives that Person 10, then a Compton City Councilmember,
> 18 had a friend who was upset that Marijuana Company 3 had not hired the
> 19 friend to represent Marijuana Company 3 in its pursuit of a marijuana
> 20 permit in Baldwin Park. Defendant knew that Person 10 and Person 1
> 21 had a relationship and believed Person 1 removed Marijuana Company 3
> 22 from the regular City Council agenda at Person 10's request. Based
> 23 on his belief that Person 1 served the agenda's gatekeeper, defendant
> 24 demanded through Pacheco to speak with Person 1. After the City
> 25 Council meeting, defendant met with Pacheco and Person 1 and told
> 26 them that Marijuana Company 3 felt extorted. Neither Pacheco nor
> 27 Person 1 pushed back at this accusation. Instead, Person 1 acted
> 28 with indifference and intimated that it came with came with the
>
> 13

**COMPLAINT**

The Law Offices of
TORRES † SIEGRIST

48. Most importantly, on **October 7, 2022**, a plea agreement was also unsealed in USA v. Ricardo Pacheco, bearing U.S.D.C. Criminal Case No. 2:20-cr-00165-ODW (See Exhibit B which is incorporated into the Complaint by reference as though fully setforth herein)

49. The disgraced former City Councilmember's plea further solidified the collusion between TAFOYA (Person No. 1), GALVAN (Person No. 10) and now convicted felon PACHECO.

50. On Page 11 of the factual basis, the PACHECO plea describes:

During the scheme, Person 1, Person 10, and defendant met on approximately five occasions at downtown Los Angeles restaurants, typically a month before the City Council voted on Cultivation Development Agreements. During these meetings, defendant and Person 10 would discuss in front of Person 1 the payments Person 10 made to defendant for his vote, and Person 1 and defendant would update Person 10 on the status of other Cultivation Development Agreement applications.

51. Most egregiously, the Pacheco plea establishes that both TAFOYA and GALVAN were in "business together" at the time they defrauded plaintiffs.

As discussed above, on December 13, 2018, FBI special agents executed a federal search warrant on defendant's residence and vehicle. After the FBI had completed its search and left the premises, defendant contacted Person 1. At the time, defendant knew that Person 1 was close to Person 10 and believed that Person 1 and Person 10 had an agreement with respect to marijuana licensing in the City. Person 1 also told defendant that he was in business with Person 10, and Person 1 and Person 10 were seeking a marijuana license in Commerce, California.

52. In fact, the Pacheco plea describes Tafoya being the architect of a collusive fraudulent cannabis scheme by the use of "consultants" who would deliver "development agreements" to their clients….not negotiated "arms length" as

1  has been represented numerous times by TAFOYA, WILLOUGHBY II, and
2  employees of the CITY.

3  53. To no one's surprise, within days of the aforementioned pleas being made
4  public Person No. 1 aka Defendant TAFOYA resigned as City Attorney of
5  Baldwin Park after 14 years in that position.

**THE CITY'S FAILURE TO COMPLY WITH THE MITIGATION FEE ACT**

54. Putting aside that the Development Agreement was born of fraud and a product
of corruption, a fundamental flaw with the CITY's unlawful pursuit of
mitigation fees as to Plaintiff is the lack of compliance by the CITY with the
Mitigation Fee Act.

55. The Mitigation Fee Act contained in the California Government Code
beginning with Section 66001 et seq, requires a local agency, such as the City
of Baldwin Park, to identify the purpose of the mitigation fee and the use to
which the fee will be put. (§66001, subd. (a) (1) and (2).)  The CITY must also
determine that both 'the fee's use ' and 'the need for the public facility ' are
reasonably related to the type of development project on which the fee is
imposed. (§66001, subd. (a) (3) and (4).) In addition, the CITY must 'determine
how there is a reasonable relationship between the amount of the fee and the
cost of the public facility or portion of the public facility attributable to the
development on which the fee is imposed.' (§66001, subd . (b) .)

56. The "reasonable relationship" standard in the Mitigation Fee Act adopts U.S.
Supreme Court takings jurisprudence establishing that governmental exactions
and fees imposed in permits must have an "essential nexus" between a
legitimate government end and the fee, and that the amount of any fee must be
"roughly proportional" to the impact created. (Ehrlich, supra at 866 [discussing

1    Dolan v. City of Tigard (1994) 512 U.S. 374 and Nolan v. Cal. Coastal Com.

2    (1987) 483 U.S. 825].)

3    57. The CITY cannot legally justify the imposition of any mitigation fees under the

4    development agreement scheme authored by a corrupt city attorney and self-

5    dealing crooked politicians.

6    **THE CITY FAILED TO RETAIN THE MITIGATION FEES IN**

7    **COMPLIANCE WITH THE MITIGATION FEE ACT.**

8    58. The CITY must deposit the mitigation fees in a separate capital facilities

9    account or fund in a manner to avoid any commingling of the fees with other

10   revenues and funds.  The CITY may expend the mitigation fees solely for the

11   purpose for which they were collected. Any interest income earned must also

12   be deposited in that account or fund and must be expended only for the purpose

13   for which the fee was originally collected. §66001(a).

14   59. To date, the mitigation fees have simply been placed in the General Fund in

15   direct contravention to Government Code §66001(e) which provides:"The

16   Legislature finds and declares that untimely or improper allocation of

17   development fees hinders economic growth and is, therefore, a matter of

18   statewide interest and concern."

19   60. Finance Director Rose Tam was deposed on May 20, 2021.

20   61. Under oath, Ms. Tam specifically provided that the cannabis "mitigation fees"

21   collected were being deposited into the City's "General Checking Account" at

22   the Bank of the West.

23   **MITIGATION FEES HAVE BEEN UNLAWFULLY UTILIZED BY THE**

24   **CITY IN DIRECT CONTRAVENTION TO THE GOVERNMENT CODE.**

25   62. Government Code § 66008, in pertinent part specifically states: "The fee shall

26   not be levied, collected, or imposed for **GENERAL REVENUE**

27   **PURPOSES**." [Emphasis Added].

28

THE LAW OFFICES OF
**TORRES SIEGRIST**

63. However, to date, the CITY has utilized the mitigation fees collected from owner/operators for just that: "general revenue purposes." Mitigation fees collected have not been utilized to mitigate any specific cannabis related impacts. Ms. Tam in her sworn deposition testimony confirmed that cannabis mitigation fees are still being unlawfully used by the CITY for "general revenue" purposes:

64. Furthermore, §66006 (b) expressly requires that the CITY on a yearly basis generate a public report identifying:

   (A) The identity of the account in which the mitigation fees are being deposited:

   (B) The amount of the mitigation fee charged;

   (C) The beginning and ending balance of the account;

   (D) The amount of the fees collected and the interest accrued;

   (E) An identification of each public improvement on which fees were expended and the amount of the expenditures on each improvement, including the total percentage of the cost of the public improvement that was funded with the mitigation fees.

65. No reports containing the statutorily required information for 2017, 2018, 2019, 2020, 2021, 2022 were ever authored, let alone published.

66. The CITY has never specifically identified exactly what the mitigation fees are being used for.

**FIRST CLAIM**

**RICO BROUGHT AS TO Defendants TAFOYA, WILLOUGHBY II, PACHECO, GALVAN, LOZANO, and MORALES AND DOES 1-50**

67. Plaintiff re-alleges and incorporate by reference each and every allegation as set forth in each paragraph above as though fully set forth herein.

68. Plaintiffs constitute a "person" who has sustained injury to their business or property by reason of Defendants' conduct, within the meaning of 18 U.S.C. § 1964(c).

69. Plaintiffs alleges that Defendants TAFOYA, WILLOUGHBY II, PACHECO, GALVAN, LOZANO, and MORALES are all "culpable persons" within the meaning of 18 U.S.C. §§ 1962(c) and 1962(d).

70. Plaintiff alleges that Defendants TAFOYA, WILLOUGHBY II, PACHECO, GALVAN, LOZANO, and MORALES and DOES 1-50 have been engaged in ongoing criminal activity for the past four years in violation of 18 U.S.C. § 1961 et seq.

71. Plaintiffs allege, that the pattern has been one of racketeering activity involving multiple criminal acts, including but not limited to, bribery, kickbacks and other improper relationships throughout the application and granting process, as well as defrauding individuals such as plaintiffs through the use and abuse of their positions within the CITY.

72. Defendants received income derived from the pattern of racketeering activity violation of 18 U.S.C. section 1962 (a).

73. Defendants have unlawfully conspired to violate subsections (a), (b), and (c) of 18 U.S.C. section 1961 et seq. (the RICO Act) in violation of 18 U.S.C. section 1962(d).

## SECOND CLAIM
### (Inverse Condemnation)
### BROUGHT AS TO ALL DEFENDANTS

74. Plaintiff re-alleges and incorporate by reference each and every allegation as set forth in each paragraph above as though fully set forth herein.

75. At all relevant times, Plaintiff is and has been the Property owner for the

subject property.

76. Defendant CITY's conduct, by and through its employees, including the individual named defendants, resulted in substantial interference with the use and enjoyment of Plaintiffs' Property which amounts to a taking and damaging of the Property for which Plaintiffs have not been compensated by and amounts to inverse condemnation, a Fifth Amendment violation pursuant to the U.S. Constitution.

77. In addition to the damages set forth above, Plaintiff has incurred and will incur fees for attorneys, and experts as a result of this proceeding in amounts that cannot be ascertained. Said fees are recoverable in this action under the provision of the Code of Civil Procedure section 1036.

**THIRD CLAIM**

**(Damages for Violations of Civil Rights Per 42 U.S.C. Section 1983)**

**BROUGHT AS TO ALL DEFENDANTS**

**(Municipal liability brought per <u>Monell</u> and its progeny)**

78. Plaintiff re-alleges and incorporate by reference each and every allegation as set forth in each paragraph above as though fully set forth herein.

79. The CITY by and through its employees, including but not limited to Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES, committed a taking of Plaintiff's Property without just compensation in violation of the Fifth Amendment to the U.S. Constitution as applicable to the states and their political subdivisions pursuant to the Fourteenth Amendment to the U.S. Constitution, and Article I, Section 19 of the California Constitution.

80. In addition, the City deprived Plaintiffs of property without due process of law and deprived Plaintiff of the equal protection of law, both in violation of

the Fourteenth Amendment to the U.S. Constitution, and Article I, Section 7(a) of the California Constitution.

81. The actions and omissions of Defendants were undertaken under the color of law by and through its employees, including but not limited to Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES,

82. Imposition of liability is brought pursuant to 42 USC Section 1983.

83. Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES, at all times complained herein acted under color of law and violated the Fifth Amendment Rights of Plaintiff under the Takings Clause.

84. The violation by Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES, caused plaintiffs financial damages as previously described.

85. Imposition of Municipal Liability upon the CITY is pursued in the instant case via <u>Monell</u> and its applicable subsets.

86. Upon information and belief, a final policymaker, including the City Manager and the City Council itself, acting under color of law, who had final policymaking authority concerning the acts of the individual CITY employees including Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES, ratified the acts of the defendants' and the basis for them and did absolutely nothing to prevent the constitutional violations.

87. These final policymakers knew of and specifically approved and/or ratified the individual defendants' acts.

88. The final policy makers determined that the acts of the individual defendants were "within policy" and continued to allow Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES, among others to continue to deprive individuals, such as plaintiffs, of their property in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution.

**COMPLAINT**

89. Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES, and DOES 1-50, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies.

90. Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiffs, and other individuals similarly situated.

91. By ratifying, perpetrating, sanctioning, and tolerating the outrageous conduct and other wrongful acts, the CITY Council, CITY Manager and DOES 1-50 acted with intentional and reckless indifference to Plaintiff's constitutional rights.

92. As a proximate result of the City's actions and omissions as described herein, Plaintiff has suffered injury and damages, and is continuing to suffer injury and damages, including but not limited to that which has been described above, which are compensable pursuant to 42 U.S.C. § 1983 and Civil Code § 52.1(b), in an amount which cannot now be ascertained but which is within the jurisdiction of this Court and shall be determined according to proof at trial.

93. As a further proximate result of the CITY'S actions and omissions, Plaintiff has incurred and will incur fees and costs for attorneys and experts, said fees and costs being legally compensable pursuant to 42 U.S.C. § 1988(b) and (c), and California law, in the course of enforcing Plaintiff's rights under 42 U.S.C. § 1983 and Civil Code § 52.1(b), and the abovementioned provisions of the California and U.S. constitutions.

94. Good cause exists for an award of exemplary and punitive damages against

Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES for constitutional deprivations.

95. In addition, Plaintiff seeks an award of compensatory damages as well as attorney's fees against Defendants CITY, TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, and MORALES, and Does 1-50.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE
## BROUGHT AS TO ALL DEFENDANTS

96. Plaintiff re-alleges and incorporate by reference each and every allegation as set forth in each paragraph above as though fully set forth herein.

97. Pursuant to California Government Code § 815.2(a), Defendant CITY as a public entity, is vicariously liable for any injuries or damages as alleged herein which were proximately caused by an act or omission of any employee of Defendant CITY within the course and scope of said employee's employment with Defendant CITY.

98. At all times herein the CITY was negligent in hiring and/or supervising Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, GALVAN and MORALES who utilized their positions as public officials/public employees to defraud plaintiffs.

99. Due to the CITY's negligence in supervision and/or hiring of Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, GALVAN and MORALES plaintiffs were damaged financially in a sum according to proof at trial.

//
///

# FIFTH CAUSE OF ACTION

## FRAUD

## BROUGHT AS TO ALL DEFENDANTS

100.    Plaintiff re-alleges and incorporate by reference each and every allegation as set forth in each paragraph above as though fully set forth herein.

101.    Pursuant to California Government Code § 815.2(a), Defendant CITY as a public entity, is vicariously liable for any injuries or damages as alleged herein which were proximately caused by an act or omission of any employee of Defendant CITY within the course and scope of said employee's employment with Defendant CITY.

102.    Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, GALVAN and MORALES knowingly engaged in fraudulent acts and omissions and/or otherwise made material misrepresentations with the intent to deceive and defraud the Plaintiffs.

103.    Defendants TAFOYA, WILLOUGHBY II, PACHECO, LOZANO, GALVAN and MORALES were motivated by corruption and/or actual malice, i.e., a conscious intent to deceive, vex, annoy, or harm plaintiffs.

104.    The CITY continues to maintain a fraudulent position even in the midst of unsealed plea deals which unequivocally established that the commercial cannabis development agreements had been compromised by the corruption and unlawful conduct of City Attorney TAFOYA, former councilman PACHECO and soon to be identified co-conspirators.

105. The fraud perpetrated by defendants caused plaintiffs to suffer financial damages according to proof at trial.

///

COMPLAINT

## SIXTH CLAIM

## DECLARATORY RELIEF

106.    Plaintiff re-alleges and incorporate by reference each and every allegation as set forth in each paragraph above as though fully set forth herein.

107.    An actual controversy has arisen and now exists between Plaintiffs and Defendant CITY relating to their respective rights and duties in that Defendants are attempting to impose an unlawful mitigation fee on Plaintiffs which is invalid and unenforceable as construed by Defendants and as applied by Defendants in that:

a.  The Development agreement is a product of corruption and collusion orchestrated by a former CITY attorney and crooked politicians.

b.  The CITY's failure to comply with the Mitigation Fee Act renders collection unenforceable:

i.  No reasonable relationship exists between the exaction/fee and the cost to the public attributable to commercial cannabis activities;

ii.  No impact studies were ever performed by the CITY justifying the exaction/fee;

iii.  Mitigation Fees collected were commingled within the CITY'S General Account;

iv.  No yearly reports required by the Government Code were ever generated by the CITY with respect to any commercial cannabis fees collected;

v.  The CITY unlawfully used commercial cannabis mitigation fees collected for "general revenue" purposes in contravention to the express provisions of the Government Code.

20

c.  Defendants' actions in thwarting Plaintiff's sale as described above constitutes an unlawful taking per the Fifth Amendment of the U.S. Constitution as well as the California Constitution.

108. Plaintiffs desire a declaration of its rights with respect to the application or non-application of the Development Agreement as well as the application or non-application of any mitigation fees due to CITY's violation of the mitigation fee act.

109. In the event the Court finds that the Development Agreement is unenforceable and/or the Mitigation Fee Act has been violated on one or more of the grounds articulated above, Plaintiff requests that this Court issue a permanent injunction prohibiting Defendants from applying, enforcing and/or imposing any commercial cannabis mitigation fees.

110. Furthermore, pursuant to <u>Walker v. City of San Clemente</u> (2015) 239 Cal.App. 4th 1350, and its progeny, Plaintiffs request a refund of <u>ALL</u> mitigation fees paid to date from the CITY.

**WHEREFORE, PLAINTIFF PRAYS AS FOLLOWS:**

AS TO ALL CAUSES OF ACTION

1.  For special damages;

2.  For general damages;

3.  For costs of suit herein;

4.   For Statutory Damages;

5.  For attorney's fees, including litigation expenses, based on all causes of action affording statutory attorney's fees: 42 U.S.C.§ 1988

6.  For punitive/exemplary damages as to the individual defendants according to proof at trial;

7. For treble damages per RICO Statute;



THE LAW OFFICES OF
TORRES | SIEGRIST

1 | and

2 | 8. For such other and further relief as the Court deems just and proper.

3 |

4 | **Date: January 8, 2023**

           **TORRES ⊣ SIEGRIST**

By:_____

      **DAVID G. TORRES-SIEGRIST**
      **Attorneys for Plaintiffs**

## DEMAND FOR JURY TRIAL

     Additionally, Plaintiffs respectfully demands a jury trial of the present case pursuant to the U.S. Constitution, the California Constitution and applicable California State and Federal Law.

           **TORRES ⊣ SIEGRIST**

**Date: January 8, 2023**

By:_____

      **DAVID G. TORRES-SIEGRIST**
      **Attorneys for Plaintiffs**

EXHIBIT A

**FILED**
CLERK, U.S. DISTRICT COURT

10/7/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___VAV___ DEPUTY

1  STEPHANIE S. CHRISTENSEN
   Acting United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
4  LINDSEY GREER DOTSON (Cal. Bar No. 266973)
   Assistant United States Attorneys
5  Public Corruption & Civil Rights Section
        1500 United States Courthouse
6        312 North Spring Street
        Los Angeles, California 90012
7        Telephone: (213) 894-8452/4443
        Facsimile: (213) 894-0141
8        E-mail:    thomas.rybarczyk@usdoj.gov
                   lindsey.dotson@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                  UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,        No. CR   2:22-cr-00462-MWF

14            Plaintiff,            PLEA AGREEMENT FOR DEFENDANT
                                    GABRIEL CHAVEZ
15            v.

16 GABRIEL CHAVEZ,

17            Defendant.

18

19       1.   This constitutes the plea agreement between GABRIEL CHAVEZ

20 ("defendant") and the United States Attorney's Office for the Central

21 District of California ("the USAO") in connection with an

22 investigation of the matter described herein.  This agreement is

23 limited to the USAO and cannot bind any other federal, state, local,

24 or foreign prosecuting, enforcement, administrative, or regulatory

25 authorities.

26 ///

27 ///

28 ///

DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a single-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with aiding and abetting Federal Program Bribery, in violation of 18 U.S.C. §§ 666(a)(2), (2)(a).

b.   Not contest the Factual Basis agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

3.   Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation, Internal Revenue Service - Criminal Investigation, and, as directed by the USAO, any other

federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.  This cooperation requires defendant to:

       a.   Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

       b.   Attend all meetings, grand jury sessions, trials, or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

       c.   Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

    4.   For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by defendant pursuant to defendant's cooperation under this agreement or pursuant to the letter agreements previously entered into by the parties dated November 11, 2020 and June 14, 2021 (the "Letter Agreements") and in his meetings with the government on November 11, 2020 and June 14, 2021; and (2) "Plea Information" shall mean any statements made by defendant, under oath, at the guilty plea hearing and the agreed to Factual Basis in this agreement.

THE USAO'S OBLIGATIONS

    5.   The USAO agrees to:

       a.   Not contest the Factual Basis agreed to in this agreement.

       b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

d.   Recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range.

6.   The USAO further agrees:

a.   Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b.   Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable Sentencing Guidelines range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to

the Court that Cooperation Information not be used in determining the applicable Sentencing Guidelines range or the sentence to be imposed. Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c.    In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d.    If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding Sentencing Guidelines range below that otherwise dictated by the Sentencing Guidelines, and to recommend a term of imprisonment within this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

7.    Defendant understands the following:

a.    Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b.    Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory

authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c. Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced Sentencing Guidelines range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d. At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance. The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e. The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation.

NATURE OF THE OFFENSE

8. Defendant understands that for defendant to be guilty of the crime charged in the single-count information, that is, Federal Program Bribery in violation of 18 U.S.C. § 666(a)(2), he must have committed the crime of Federal Program Bribery and/or aided and abetted in its commission.

9. For defendant to have committed the crime of Federal Program Bribery in violation of 18 U.S.C. § 666(a)(2), the following must be true:

6

1          a.    Defendant corruptly gave, offered, or agreed to give

2    something of value to a person;

3          b.    Defendant intended to influence or reward an agent of

4    a local government -- here, the City of Baldwin Park -- in connection

5    with any business, transaction, or series of transactions of that

6    local government involving anything of value of $5,000 or more; and

7          c.    The City of Baldwin Park received, in any one-year

8    period, benefits in excess of $10,000 under a Federal program

9    involving a grant, contract, subsidy, loan, guarantee, insurance, or

10   other form of Federal assistance.

11      10.   For defendant to have aided and abetted in the commission

12   of Federal Program Bribery in violation of 18 U.S.C. § 666(a)(2), the

13   following must be true:

14         a.    Someone else committed Federal Program Bribery;

15         b.    Defendant aided, counseled, commanded, induced, or

16   procured that person with respect to at least one element of Federal

17   Program Bribery;

18         c.    Defendant acted with the intent to facilitate Federal

19   Program Bribery; and

20         d.    Defendant acted before the crime was completed.

21                                PENALTIES

22      11.   Defendant understands that the statutory maximum sentence

23   that the Court can impose for a violation of 18 U.S.C. § 666(a)(2)

24   is: 10 years' imprisonment; a three-year period of supervised

25   release; a fine of $250,000 or twice the gross gain or gross loss

26   resulting from the offense, whichever is greatest; and a mandatory

27   special assessment of $100.

28

12.    Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

13.    Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

14.    Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The Court cannot, and defendant's attorney also may not be able to, advise defendant

fully regarding the immigration consequences of the felony conviction in this case.  Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty plea.

FACTUAL BASIS

15.  Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 17 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

**A.   Background**

The City of Baldwin Park, California (the "City") is a local government within the County of Los Angeles.  The City received in excess of $10,000 under a Federal program for each of the calendar years 2017 and 2018.

Ricardo Pacheco ("Pacheco") was elected to the City Council for the City of Baldwin Park (the "City") in 1997 and held that position until in or around June 2020.  He also served as the City's Mayor Pro Tempore from in or around December 2017 to December 2018.  In both roles, he was as an agent of the City.

Defendant founded Market Share Media Agency, an internet marketing company, in 2012.

9

1        Person 1[1] has served as the Baldwin Park City Attorney since in

2    or around December 2013.

3        Person 14 has been the City Manager for the City of Commerce

4    since in or around November 2017.  Prior to that, he was the City

5    Manager for Huntington Park and a Member of the Montebello Unified

6    School District Board.  He is the Chief Executive Officer of

7    Consulting Company 3.

8        **B.    The Marijuana Company 3 and Marijuana Company 4 Bribery**
         **Schemes**

9
10               1.   Overview of the Schemes

11       In or around June 2017, the City started the process of

     permitting the sale, cultivation, and manufacture of marijuana within
12
     the City's limits.  Around that same time, Pacheco decided to
13
     corruptly solicit bribe payments from companies seeking marijuana
14
     development agreements and related permits ("marijuana permits") in
15
     the City.  In exchange for the payments, Pacheco would agree to
16
     assist and assist the companies, using his official City position,
17
     with obtaining marijuana permits.
18
         Pacheco elected to use an intermediary to funnel the bribe
19
     payments to himself in an effort to disguise the true nature of the
20
     payments.  The scheme would operate as follows: a company seeking a
21
     marijuana permit would pay the intermediary for supposed "consulting"
22
     services, the intermediary would then split a portion of the money
23
     with Pacheco, and Pacheco would then vote in favor of the company's
24
     desired marijuana permit in exchange for the payment.  Pacheco would
25
     also agree to use his influence as a City Council member to ensure
26

27   _____

28       [1] A legend detailing the names of the masked persons and
     companies is attached hereto as Exhibit B.

                                  10

that other members of the City Council voted in favor of the marijuana permit as well.

Defendant was asked by Pacheco to act as an intermediary to funnel bribes to Pacheco, and defendant agreed.  To help conceal the bribery scheme, defendant obtained a template for a sham consulting agreement from Person 1, which defendant thereafter used to facilitate and disguise the scheme.  Defendant used his company, Market Share Media Agency, to funnel bribe payments to Pacheco from two companies, Marijuana Company 3 and Marijuana Company 4.  Both companies hired defendant to help them obtain marijuana permits, but rather than perform legitimate consulting services, defendant primarily funneled bribe payments to Pacheco in order to ensure that Pacheco and the City Council voted in favor of both companies' marijuana permits.  Defendant used the template for the sham consulting agreement provided by Person 1 for the contracts with Marijuana Company 3 and Consulting Company 3, which represented Marijuana Company 4.

From approximately August 2017 to at least March 2018, defendant received at least $125,000 from Marijuana Company 3 and at least $45,000 from Consulting Company 3 on behalf of Marijuana Company 4, none of which he reported to the Internal Revenue Service as personal income or as revenue for Market Share Media Agency.  Defendant then paid Pacheco between $80,000 and $93,000 in cash, out of the at least $170,000 collected from both companies.  Per defendant's agreement with Pacheco, the cash payments were in exchange for Pacheco's votes on the two companies' marijuana permits and Pacheco's help securing the necessary votes from other members of the City Council.  Defendant and Pacheco agreed that Pacheco would get 60 percent from

the Marijuana Company 3 and Consulting Company 3/Marijuana Company 4 contracts and that defendant could retain the rest as payment primarily for facilitating the bribes.

On multiple occasions, defendant used coded language in text messages to tell Pacheco that he had cash bribes to pass to Pacheco. Specifically, defendant used the word "documents" to mean cash.  For example, on January 9, 2018, defendant sent Pacheco a text message stating "I'm planning to bring all the documents . . ." by which defendant meant he planned to bring Pacheco cash bribes.

To keep track of the cash bribes to Pacheco, defendant used a draft email with the subject line "Dodge Truck" to keep a running tally of the cash provided to Pacheco.  One draft indicated defendant had provided Pacheco $80,080 in cash as of February 27, 2018, including $12,000 on or around February 5, 2018 and $13,000 on or around February 27, 2018.  Defendant provided Pacheco even more cash than was accounted for on this running email tally.

Pacheco performed his end of the bargain, voting in favor of the Marijuana Company 3 and Marijuana Company 4's marijuana permits. First, on December 13, 2017, Pacheco voted in favor of conditional marijuana permits for Marijuana Company 3 and Marijuana Company 4, and the City Council approved conditional marijuana permits for both companies.  Second, on May 2, 2018, Pacheco voted in favor of both companies' marijuana permits again, and the City Council approved their applications by a 3-0 vote.

2.   The Marijuana Company 3 Permit

With respect to the Marijuana Company 3 permit, in and around June 2017, Pacheco arranged a meeting between defendant and Person 15, an attorney assisting Marijuana Company 3 in its pursuit of a

marijuana permit.  Before doing so, Pacheco had encouraged defendant
-- who had never worked as a consultant -- to assist two companies
seeking marijuana permits in Baldwin Park, one of which was Marijuana
Company 3.  After meeting with Person 15 in June 2017, defendant met
with Person 15 and Marijuana Company 3's owners, Person 16 and Person
17.  During this meeting, defendant learned that the amount of the
consulting contract was predetermined without his input.

As defendant and Marijuana Company 3 entered into a contract
in August 2017 and defendant received a total of $24,500 Marijuana
Company 3 and Person 17 that month, defendant started passing cash to
Pacheco in exchange for Pacheco's vote and influence in getting
Marijuana Company 3's permit approved.

In Fall 2017, Marijuana Company 3 appeared on a draft agenda
of the regular City Council meeting, but when the final agenda
posted, Marijuana Company 3 was no longer listed on it.  Around this
same time, defendant learned from Marijuana Company 3's
representatives that Person 10, then a Compton City Councilmember,
had a friend who was upset that Marijuana Company 3 had not hired the
friend to represent Marijuana Company 3 in its pursuit of a marijuana
permit in Baldwin Park.  Defendant knew that Person 10 and Person 1
had a relationship and believed Person 1 removed Marijuana Company 3
from the regular City Council agenda at Person 10's request.  Based
on his belief that Person 1 served the agenda's gatekeeper, defendant
demanded through Pacheco to speak with Person 1.  After the City
Council meeting, defendant met with Pacheco and Person 1 and told
them that Marijuana Company 3 felt extorted.  Neither Pacheco nor
Person 1 pushed back at this accusation.  Instead, Person 1 acted
with indifference and intimated that it came with came with the

territory.  Defendant later learned that Person 15 had brokered a deal between Marijuana Company 3, Person 10, and Person 10's friend, which prompted the renegotiation of defendant's contract with Marijuana Company 3 later that month.

### 3.   The Marijuana Company 4 Permit

With respect to the Marijuana Company 4 permit, Person 14 and his company, Consulting Company 3, represented Marijuana Company 4 in its pursuit of a marijuana permit in Baldwin Park.  As a way to compensate defendant and, in turn, Pacheco for securing the marijuana permit for Marijuana Company 4, Person 14 through Consulting Company 3 made payments to defendant's Market Share Media Agency of at least $45,000 from approximately August 2017 through February 2018 during which time Marijuana Company 4 sought and received its marijuana permit.  Beyond sending and/or forwarding emails, Market Share Media Agency and defendant did little work for Consulting Company 3 or Marijuana Company 4.  Defendant and Person 14 both understood that Person 14 would do most of the work necessary to help Marijuana Company 4 obtain its marijuana permit in Baldwin Park.  As both defendant and Person 14 knew, the Consulting Company 3 payments to Market Share Media Agency were bribe payments for Pacheco disguised to look like legitimate consulting fees, including through the use of bogus invoices.

Defendant's corrupt relationship with Pacheco and Person 14 with respect to Marijuana Company 4's permit began in the summer of 2017 when Pacheco introduced defendant to Person 14.  Pacheco wanted defendant to "represent" a marijuana permit applicant in Baldwin Park so that Pacheco could receive bribe payments from the applicant funneled to Pacheco through defendant.  At Pacheco's request,

defendant went to a meeting at a restaurant in Baldwin Park.  There, defendant first met Person 14, whose company, Consulting Company 3, represented Marijuana Company 4.  Pacheco said that Person 14 was a school board member and the City Manager of Huntington Park.  During the meeting, Pacheco made clear to Person 14 that defendant represented Pacheco and that Person 14 should use defendant's services to secure Marijuana Company 4's marijuana permit.

Following the meeting, Person 14 and defendant entered into a written agreement on or about August 1, 2017.  The party signing for Consulting Company 3 (Person 14's company) was an individual with the initials F.M. -- a man whom defendant had never met and did not know. Pursuant to the agreement, defendant's company was to receive $250,000 over a series of six payments, the majority of which would come after Person 14's/Consulting Company 3's client (Marijuana Company 4) obtained its marijuana permit.

When Person 14 complained to defendant about the amount of money he paid defendant, defendant told him that Pacheco was getting 60 percent of the money Person 14 paid him through Consulting Company 3.  Even after that express acknowledgment of Pacheco's role and receipt of bribe payments, Person 14 continued to pay defendant.

Person 14 subsequently renegotiated Consulting Company 3's contract with Pacheco, not defendant, and included a non-disclosure condition as an addendum.  Person 14 first sent this non-disclosure condition addendum to defendant on or about August 31, 2017 via email and wrote "Per our conversation, here's the 2nd addendum with the non disclosure language . . discretion is a must for us and most appreciated."  That addendum and along with another contractual addendum reducing the amount Consulting Company 3 had to pay

15

defendant's company to $190,000 was signed on or about September 2, 2017 by Person 14, not F.M.  Defendant also signed the contract and addenda.  Later, Person 14 and Pacheco again renegotiated defendant's contract and reduced the cost of the contract to $185,000, $170,000 of which was to be paid after Marijuana Company 4 obtained its marijuana permit.  Both Person 14 and defendant signed this agreement on or about September 26, 2017.

In addition, defendant's Market Share Media Agency also received a no-bid $14,500 contract from the City of Huntington Park signed by Person 14 as its City Manager.  The no-bid contract represented, at least in part, further compensation for defendant in his efforts to secure the marijuana permit for Marijuana Company 4. In violation of the contract's terms, Market Share Media Agency received payment from Huntington Park before completing its services.

Finally, to further secure the Marijuana Company 4 permit, Person 14 gave defendant a $5,000 check made payable to the church associated with the school attended by Pacheco's child.

SENTENCING FACTORS

16.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds

appropriate up to the maximum set by statute for the crime of conviction.

17.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 12 | [U.S.S.G. § 2C1.1(a)(2)] |
| More Than One Bribe: | +2 | [U.S.S.G. § 2C1.1(b)(1)] |
| Value of Bribe > $150,000: | +10 | [U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(F)] |
| Elected Public Official: | +4 | [U.S.S.G. § 2C1.1(b)(3)] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

18.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

19.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. §§ 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

WAIVER OF CONSTITUTIONAL RIGHTS

20.   Defendant understands that by pleading guilty, defendant gives up the following rights:

        a.   The right to persist in a plea of not guilty.

        b.   The right to a speedy and public trial by jury.

        c.   The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be

1  represented by counsel -- and if necessary have the Court appoint

2  counsel -- at every other stage of the proceeding.

3          d.    The right to be presumed innocent and to have the

4  burden of proof placed on the government to prove defendant guilty

5  beyond a reasonable doubt.

6          e.    The right to confront and cross-examine witnesses

7  against defendant.

8          f.    The right to testify and to present evidence in

9  opposition to the charges, including the right to compel the

10  attendance of witnesses to testify.

11          g.    The right not to be compelled to testify, and if

12  defendant chose not to testify or present evidence, to have that

13  choice not be used against defendant.

14          h.    Any and all rights to pursue any affirmative defenses,

15  Fourth Amendment or Fifth Amendment claims, and other pretrial

16  motions that have been filed or could be filed.

17                    <u>WAIVER OF APPEAL OF CONVICTION</u>

18      21.  Defendant understands that, with the exception of an appeal

19  based on a claim that defendant's guilty plea was involuntary, by

20  pleading guilty defendant is waiving and giving up any right to

21  appeal defendant's conviction on the offense to which defendant is

22  pleading guilty.  Defendant understands that this waiver includes,

23  but is not limited to, arguments that the statute to which defendant

24  is pleading guilty is unconstitutional, and any and all claims that

25  the statement of facts provided herein is insufficient to support

26  defendant's plea of guilty.

27

28

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

22.  Defendant agrees that, provided the Court imposes a term of imprisonment within or below the range corresponding to an offense level of 25 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Order 18-10 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

23.  The USAO agrees that, provided all portions of the sentence are at or below the statutory maximum specified above, the USAO gives up its right to appeal any portion of the sentence.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

24.  Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any

19

investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible; and (c) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

### EFFECTIVE DATE OF AGREEMENT

25.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

### BREACH OF AGREEMENT

26.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.   For example, if defendant

knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b.   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated not to criminally prosecute pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c.   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d.   In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

27.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## COURT AND UNITED STATES PROBATION

## & PRETRIAL SERVICES OFFICE NOT PARTIES

28.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

29.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court; (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence; and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the sentencing calculations set forth above are consistent with the facts of this case.   This paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the Factual Basis or Sentencing Factors agreed to in this agreement.

30.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.   Defendant

1  understands that no one -- not the prosecutor, defendant's attorney,

2  or the Court -- can make a binding prediction or promise regarding

3  the sentence defendant will receive, except that it will be within

4  the statutory maximum.

5                          NO ADDITIONAL AGREEMENTS

6      31.  Defendant understands that, except as set forth herein,

7  there are no promises, understandings, or agreements between the USAO

8  and defendant or defendant's attorney, and that no additional

9  promise, understanding, or agreement may be entered into unless in a

10  writing signed by all parties or on the record in court.

11  ///

12  ///

13  ///

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

32.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

STEPHANIE S. CHRISTENSEN
Acting United States Attorney


_____          October 7, 2022
THOMAS F. RYBARCYK                        _____
LINDSEY GREER DOTSON                       Date
Assistant United States Attorneys


_____          8/30/22
GABRIEL CHAVEZ                            _____
Defendant                                 Date


_____          8/30/22
FRANCISCO SUAREZ                         _____
Attorney for Defendant                    Date
GABRIEL CHAVEZ

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

GABRIEL CENAVEZ
Defendant

Date 8/30/22

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am GABRIEL CHAVEZ'S attorney.  I have carefully and thoroughly discussed every part of this agreement with my client.  Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the Factual Basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

FRANCISCO SUAREZ                          8/30/22
Attorney for Defendant                    Date
GABRIEL CHAVEZ

# EXHIBIT A

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE CENTRAL DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,          CR No.

11             Plaintiff,               I N F O R M A T I O N

12             v.                       [18 U.S.C. § 666(a)(2):
                                        Federal Program Bribery]
13   GABRIEL CHAVEZ,

14             Defendant.

15

16        The Acting United States Attorney charges:

17                     [18 U.S.C. §§ 666(a)(2), 2(a)]

18        At times relevant to this Information:

19   A.   PERSONS AND ENTITIES

20        1.   The City of Baldwin Park, California (the "City") was a

21   local government located within Los Angeles County in the Central

22   District of California.  The City received in excess of $10,000 under

23   federal programs in both 2017 and 2018.

24        2.   The City was governed, in part, by its City Council, which

25   adopted legislation, set policy, adjudicated issues, and established

26   the budget for the City.

27

28

3.     The City Council was comprised of four City Council members and a mayor, all of whom were elected at large by the City's registered voters.

4.     Ricardo Pacheco ("Pacheco") was first elected to the City Council in 1997 and held that elected position until 2020.  He also previously served as the City's Mayor Pro Tempore.  In both roles, Pacheco was an agent of the City.

5.     Defendant GABRIEL CHAVEZ founded Market Share Media Agency, an internet marketing company, in 2012.

B.     THE SCHEME

6.     In or around June 2017, the City started the process of permitting the sale, cultivation, and manufacture of marijuana within the City's limits.  Shortly thereafter, Pacheco decided to corruptly solicit bribe payments from companies seeking marijuana development agreements and related permits ("marijuana permits") in the City.  In exchange for the payments, Pacheco would agree to assist and assist the companies, using his official City position, with obtaining marijuana permits.

7.     Pacheco elected to use an intermediary to funnel the bribe payments to himself in an effort to disguise the true nature of the payments.  The scheme would operate as follows: a company seeking a marijuana permit would pay the intermediary for supposed "consulting" services, the intermediary would then split a portion of the money with Pacheco, and Pacheco would then vote in favor of the company's desired marijuana permit in exchange for the payment.  Pacheco would also agree to use his influence as a City Council member to ensure that other members of the City Council voted in favor of the marijuana permit as well.

8.   Defendant CHAVEZ was asked by Pacheco to act as an intermediary to funnel bribes to Pacheco, and defendant CHAVEZ agreed.

9.   To help conceal the bribery scheme, defendant CHAVEZ obtained a template for a sham consulting agreement from Person 1, which defendant CHAVEZ thereafter used to facilitate and disguise the scheme.

10.   Defendant CHAVEZ used his company, Market Share Media Agency, to funnel bribe payments to Pacheco in exchange for Pacheco's votes and influence over the City's permitting process to secure marijuana permits for two companies, Marijuana Company 3 and Marijuana Company 4.

11.   Defendant CHAVEZ obtained bribe payments to pass to Pacheco from Person 14, who was helping Marijuana Company 4 obtain its marijuana permit.  To conceal the true nature of the payments, the bribes defendant CHAVEZ accepted were disguised as consulting payments from Person 14's consulting company to defendant CHAVEZ's company, Market Share Media Agency.  Defendant CHAVEZ kept the remainder of the payments not provided to Pacheco in exchange for defendant CHAVEZ's services as an intermediary for the bribe payments.

///

///

///

3

1  C.   <u>THE BRIBERY</u>

2      12.   Beginning in or around August 2017 and continuing to in or

3  around March 2018, in Los Angeles County, within the Central District

4  of California, defendant CHAVEZ, aiding and abetting Pacheco, Person

5  14, and others, demanded, accepted, and agreed to accept things of

6  value, namely, at least $125,000 from Marijuana Company 3 and at

7  least $45,000 from Person 14 through Person 14's consulting company,

8  intending to influence and reward Pacheco, an agent of the City of

9  Baldwin Park, in connection with a business, transaction, and series

10 of transactions of the City having a value of $5,000 or more,

11 specifically, the City's approval and awarding of marijuana

12 development agreements and related permits.

13

14                              STEPHANIE S. CHRISTENSEN
                                Acting United States Attorney
15

16

17                              SCOTT M. GARRINGER
                                Assistant United States Attorney
18                              Chief, Criminal Division

19                              MACK E. JENKINS
                                Assistant United States Attorney
20                              Chief, Public Corruption and
                                Civil Rights Section
21
                                THOMAS F. RYBARCZYK
22                              Assistant United States Attorney
                                Public Corruption and Civil
23                              Rights Section

24                              LINDSEY GREER DOTSON
                                Assistant United States Attorney
25                              Deputy Chief, Public Corruption
                                and Civil Rights Section
26

27

28

                                    4

EXHIBIT B

LODGED

1   NICOLA T. HANNA
    United States Attorney
2   BRANDON D. FOX
    Assistant United States Attorney
3   Chief, Criminal Division
    THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
4   Assistant United States Attorney
    Public Corruption & Civil Rights Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-8452
7       Facsimile: (213) 894-0141
        E-mail:    thomas.rybarczyk@usdoj.gov
8
    Attorneys for Plaintiff
9   UNITED STATES OF AMERICA

2020 MAR 26  PM 2:42

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES
BY:_____

10                  UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12   UNITED STATES OF AMERICA,        No. CR 2 0 CR 0 0 1 6 5

13              Plaintiff,            PLEA AGREEMENT FOR DEFENDANT
                                      RICARDO PACHECO
14              v.
                                      UNDER SEAL
15   RICARDO PACHECO,

16              Defendant.

17

18       1.     This constitutes the plea agreement between RICARDO PACHECO

19   ("defendant") and the United States Attorney's Office for the Central

20   District of California ("the USAO") in connection with an

21   investigation of defendant's acceptance of bribes as a Councilmember

22   for the City of Baldwin Park. This agreement is limited to the USAO

23   and cannot bind any other federal, state, local, or foreign

24   prosecuting, enforcement, administrative, or regulatory authorities.

25                      DEFENDANT'S OBLIGATIONS

26       2.     Defendant agrees to:

27       a.     Give up the right to indictment by a grand jury and,

28   at the earliest opportunity requested by the USAO and provided by the



Court, appear and plead guilty to a single count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Bribery Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)(1)(B).

 b. Not contest facts agreed to in this agreement.

 c. Abide by all agreements regarding sentencing contained in this agreement.

 d. Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

 e. Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

 f. Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

 g. Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

 h. Agree to waive the protections of the Letter Agreements defined below in paragraph 4.

 i. Resign immediately as a City of Baldwin Park Councilmember and not seek elective or appointive office during the duration of supervised release.

 j. Defendant further agrees:

  i. To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived

2

1   from or acquired as a result of, or used to facilitate the commission
2   of, or involved in the illegal activity to which defendant is
3   pleading guilty, including but not limited to the following:

4               A.   $83,145.00 in U.S. currency, which consists
5   of $20,245.00 seized on December 13, 2018 from various locations
6   throughout defendant's home, including in a safe in defendant's
7   bedroom, and $62,900.00 seized on October 4, 2019 from defendant,
8   which defendant had buried in two different locations in his backyard
9   (the "Forfeitable Assets").

10              2.   To the Court's entry of an order of forfeiture at
11  or before sentencing with respect to the Forfeitable Assets and to
12  the forfeiture of the assets.

13              3.   To take whatever steps are necessary to pass to
14  the United States clear title to the Forfeitable Assets, including,
15  without limitation, the execution of a consent decree of forfeiture
16  and the completing of any other legal documents required for the
17  transfer of title to the United States.

18              4.   Not to contest any administrative forfeiture
19  proceedings or civil judicial proceedings commenced against the
20  Forfeitable Assets.  If defendant submitted a claim and/or petition
21  for remission for all or part of the Forfeitable Assets on behalf of
22  himself or any other individual or entity, defendant shall and hereby
23  does withdraw any such claims or petitions, and further agrees to
24  waive any right he may have to seek remission or mitigation of the
25  forfeiture of the Forfeitable Assets.

26              5.   Not to assist any other individual in any effort
27  falsely to contest the forfeiture of the Forfeitable Assets.

28

                              3

6. Not to claim that reasonable cause to seize the Forfeitable Assets was lacking.

7. To prevent the transfer, sale, destruction, or loss of the Forfeitable Assets to the extent defendant has the ability to do so.

8. To fill out and deliver to the USAO a completed financial statement listing defendant's assets on a form provided by the USAO.

9. That forfeiture of Forfeitable Assets shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

10. To the entry of, as part of defendant's guilty plea, a personal money judgment of forfeiture against defendant in the amount of $219,755.00, which sum defendant admits was derived from proceeds traceable to the violations described in the factual basis of this plea agreement. Defendant understands that the money judgment of forfeiture is part of defendant's sentence, and is separate from any fines or restitution that may be imposed by the Court.

11. With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Assets and

1   entry of Money Judgment in any proceeding on any grounds including,

2   without limitation, that the forfeiture constitutes an excessive fine

3   or punishment. Defendant acknowledges that the forfeiture of the

4   Forfeitable Assets and entry of the Money Judgment are part of the

5   sentence that may be imposed in this case and waives any failure by

6   the Court to advise defendant of this, pursuant to Federal Rule of

7   Criminal Procedure 11(b)(1)(J), at the time the Court accepts

8   defendant's guilty plea.

9       3.    Defendant further agrees to cooperate fully with the USAO,

10   the Federal Bureau of Investigation, and, as directed by the USAO,

11   any other federal, state, local, or foreign prosecuting, enforcement,

12   administrative, or regulatory authority. This cooperation requires

13   defendant to:

14          a.    Respond truthfully and completely to all questions

15   that may be put to defendant, whether in interviews, before a grand

16   jury, or at any trial or other court proceeding.

17          b.    Attend all meetings, grand jury sessions, trials or

18   other proceedings at which defendant's presence is requested by the

19   USAO or compelled by subpoena or court order.

20          c.    Produce voluntarily all documents, records, or other

21   tangible evidence relating to matters about which the USAO, or its

22   designee, inquires.

23       4.    For purposes of this agreement: (1) "Cooperation

24   Information" shall mean any statements made, or documents, records,

25   tangible evidence, or other information provided, by defendant

26   pursuant to defendant's cooperation under this agreement or pursuant

27   to the letter agreements previously entered into by the parties dated

28   April 29, 2019, May 30, 2019, July 16, 2019, and September 5, 2019

(the "Letter Agreements") and in his meeting with the government on January 27, 2020; and (2) "Plea Information" shall mean any statements made by defendant, under oath, at the guilty plea hearing and the agreed to factual basis statement in this agreement.

### THE USAO'S OBLIGATIONS

5. The USAO agrees to:

    a. Not contest facts agreed to in this agreement.

    b. Abide by all agreements regarding sentencing contained in this agreement.

    c. Recommend that the Court vary downward in total offense level by an additional two levels based on his agreement to waive the protections given to him in the Letter Agreements detailed above in paragraph 4.

    d. At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

    e. Recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range provided that the offense level used by the Court to determine that range is 29 or higher and provided that the Court does not depart downward in offense level or criminal history category. For purposes of this agreement, the low end of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A.

6. The USAO further agrees:

6

a. Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury; and (4) at defendant's sentencing. Defendant understands that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court.

b. In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

c. If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

**DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION**

7. Defendant understands the following:

7

1          a.   Any knowingly false or misleading statement by
2    defendant will subject defendant to prosecution for false statement,
3    obstruction of justice, and perjury and will constitute a breach by
4    defendant of this agreement.

5          b.   Nothing in this agreement requires the USAO or any
6    other prosecuting, enforcement, administrative, or regulatory
7    authority to accept any cooperation or assistance that defendant may
8    offer, or to use it in any particular way.

9          c.   Defendant cannot withdraw defendant's guilty plea if
10   the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a
11   reduced guideline range or if the USAO makes such a motion and the
12   Court does not grant it or if the Court grants such a USAO motion but
13   elects to sentence above the reduced range.

14         d.   At this time the USAO makes no agreement or
15   representation as to whether any cooperation that defendant has
16   provided or intends to provide constitutes or will constitute
17   substantial assistance.  The decision whether defendant has provided
18   substantial assistance will rest solely within the exclusive judgment
19   of the USAO.

20         e.   The USAO's determination whether defendant has
21   provided substantial assistance will not depend in any way on whether
22   the government prevails at any trial or court hearing in which
23   defendant testifies or in which the government otherwise presents
24   information resulting from defendant's cooperation.  That is, whether
25   any person is found guilty or not guilty will not affect what
26   benefit, if any, defendant receives in exchange for his truthful
27   testimony.

28

                                  8

1          NATURE OF THE OFFENSE

2          8.   Defendant understands that for defendant to be guilty of
3    the crime charged in the single-count information, that is, Bribery
4    Concerning Programs Receiving Federal Funds, in violation of Title
5    18, United States Code, Section 666(a)(1)(B); the following must be
6    true: (1) defendant was an agent of a state or local government, or
7    any agency of that government; (2) the City of Baldwin Park received,
8    in any one-year period, benefits in excess of $10,000 under a Federal
9    program involving a grant, contract, subsidy, loan, guarantee,
10   insurance, or other form of Federal assistance; (3) defendant
11   solicited, demanded, accepted, or agreed to accept anything of value
12   from another person; (4) defendant acted corruptly with the intent to
13   be influenced or rewarded in connection with the business,
14   transaction, or series of transactions of the City of Baldwin Park;
15   and (5) the value of the business to which the payment related was at
16   least $5,000.

17          PENALTIES

18          9.   Defendant understands that the statutory maximum sentence
19   that the Court can impose for a violation of Title 18, United States
20   Code, Section 666(a)(1)(B), is: 10 years of imprisonment; a 3-year
21   period of supervised release; a fine of $250,000 or twice the gross
22   gain or gross loss resulting from the offense, whichever is greatest;
23   and a mandatory special assessment of $100.

24          10.  Defendant understands that supervised release is a period
25   of time following imprisonment during which defendant will be subject
26   to various restrictions and requirements.  Defendant understands that
27   if defendant violates one or more of the conditions of any supervised
28   release imposed, defendant may be returned to prison for all or part

1   of the term of supervised release authorized by statute for the
2   offense that resulted in the term of supervised release, which could
3   result in defendant serving a total term of imprisonment greater than
4   the statutory maximum stated above.

5      11.  Defendant understands that, by pleading guilty, defendant
6   may be giving up valuable government benefits and valuable civic
7   rights, such as the right to vote, the right to possess a firearm,
8   the right to hold office, and the right to serve on a jury.
9   Defendant understands that he is pleading guilty to a felony and that
10  it is a federal crime for a convicted felon to possess a firearm or
11  ammunition.  Defendant understands that the conviction in this case
12  may also subject defendant to various other collateral consequences,
13  including but not limited to revocation of probation, parole, or
14  supervised release in another case and suspension or revocation of a
15  professional license.  Defendant understands that unanticipated
16  collateral consequences will not serve as grounds to withdraw
17  defendant's guilty plea.

18     12.  Defendant and his counsel have discussed the fact that, and
19  defendant understands that, if defendant is not a United States
20  citizen, the conviction in this case makes it practically inevitable
21  and a virtual certainty that defendant will be removed or deported
22  from the United States.  Defendant may also be denied United States
23  citizenship and admission to the United States in the future.
24  Defendant understands that while there may be arguments that
25  defendant can raise in immigration proceedings to avoid or delay
26  removal, removal is presumptively mandatory and a virtual certainty
27  in this case.  Defendant further understands that removal and
28  immigration consequences are the subject of a separate proceeding and

10

1  that no one, including his attorney or the Court, can predict to an
2  absolute certainty the effect of his conviction on his immigration
3  status.  Defendant nevertheless affirms that he wants to plead guilty
4  regardless of any immigration consequences that his plea may entail,
5  even if the consequence is automatic removal from the United States.

6                            FACTUAL BASIS

7          13.  Defendant admits that defendant is, in fact, guilty of the
8  offense to which defendant is agreeing to plead guilty.  Defendant
9  and the USAO agree to the statement of facts set forth in Exhibit B
10 to this agreement, and agree that this statement of facts is
11 sufficient to support a plea of guilty to the charge described in
12 this agreement and to establish the Sentencing Guidelines factors set
13 forth in paragraph 15, but is not meant to be a complete recitation
14 of all facts relevant to the underlying criminal conduct or all facts
15 known to either party that relate to that conduct.

16                          SENTENCING FACTORS

17         14.  Defendant understands that in determining defendant's
18 sentence the Court is required to calculate the applicable Sentencing
19 Guidelines range and to consider that range, possible departures
20 under the Sentencing Guidelines, and the other sentencing factors set
21 forth in 18 U.S.C. § 3553(a).  Defendant understands that the
22 Sentencing Guidelines are advisory only, that defendant cannot have
23 any expectation of receiving a sentence within the calculated
24 Sentencing Guidelines range, and that after considering the
25 Sentencing Guidelines and the other § 3553(a) factors, the Court will
26 be free to exercise its discretion to impose any sentence it finds
27 appropriate up to the maximum set by statute for the crime of
28 conviction.

                                11

15. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 14 | [U.S.S.G. § 2C1.1(a)] |
| More than one bribe: | +2 | [U.S.S.G. § 2C1.1(b)(1)] |
| Value of payment/benefit exceeds $550,000: | +14 | [U.S.S.G. § 2C1.1(b)(2)] |
| Elected Public Official | +4 | [U.S.S.G. § 2C1.1(b)(3)] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

16. Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

17. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

## WAIVER OF CONSTITUTIONAL RIGHTS

18. Defendant understands that by pleading guilty, defendant gives up the following rights:

a. The right to persist in a plea of not guilty.

b. The right to a speedy and public trial by jury.

c. The right to be represented by counsel – and if necessary have the Court appoint counsel – at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

1        d.   The right to be presumed innocent and to have the

2  burden of proof placed on the government to prove defendant guilty

3  beyond a reasonable doubt.

4        e.   The right to confront and cross-examine witnesses

5  against defendant.

6        f.   The right to testify and to present evidence in

7  opposition to the charges, including the right to compel the

8  attendance of witnesses to testify.

9        g.   The right not to be compelled to testify, and, if

10  defendant chose not to testify or present evidence, to have that

11  choice not be used against defendant.

12        h.  Any and all rights to pursue any affirmative defenses,

13  Fourth Amendment or Fifth Amendment claims, and other pretrial

14  motions that have been filed or could be filed.

15                WAIVER OF APPEAL OF CONVICTION

16     19.   Defendant understands that, with the exception of an appeal

17  based on a claim that defendant's guilty plea was involuntary, by

18  pleading guilty defendant is waiving and giving up any right to

19  appeal defendant's conviction on the offense to which defendant is

20  pleading guilty. Defendant understands that this waiver includes,

21  but is not limited to, arguments that the statute to which defendant

22  is pleading guilty is unconstitutional, and any and all claims that

23  the statement of facts provided herein is insufficient to support

24  defendant's plea of guilty.

25        LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

26     20.   Defendant agrees that, provided the Court imposes a term of

27  imprisonment within or below the range corresponding to an offense

28  level of 29 and the criminal history category calculated by the

1  Court, defendant gives up the right to appeal all of the following:
2  (a) the procedures and calculations used to determine and impose any
3  portion of the sentence; (b) the term of imprisonment imposed by the
4  Court; (c) the fine imposed by the Court, provided it is within the
5  statutory maximum; (d) to the extent permitted by law, the
6  constitutionality or legality of defendant's sentence, provided it is
7  within the statutory maximum; (e) the term of probation or supervised
8  release imposed by the Court, provided it is within the statutory
9  maximum; and (f) any of the following conditions of probation or
10 supervised release imposed by the Court: the conditions set forth in
11 General Order 18-10 of this Court; the drug testing conditions
12 mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and
13 drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

14      21.  The USAO agrees that, provided all portions of the sentence
15 are at or below the statutory maximum specified above, the USAO gives
16 up its right to appeal any portion of the sentence.

17                    RESULT OF WITHDRAWAL OF GUILTY PLEA

18      22.  Defendant agrees that if, after entering a guilty plea
19 pursuant to this agreement, defendant seeks to withdraw and succeeds
20 in withdrawing defendant's guilty plea on any basis other than a
21 claim and finding that entry into this plea agreement was
22 involuntary, then (a) the USAO will be relieved of all of its
23 obligations under this agreement, including in particular its
24 obligations regarding the use of Cooperation Information; (b) in any
25 investigation, criminal prosecution, or civil, administrative, or
26 regulatory action, defendant agrees that any Cooperation Information
27 and any evidence derived from any Cooperation Information shall be
28 admissible against defendant, and defendant will not assert, and

                                    14

1   hereby waives and gives up, any claim under the United States
2   Constitution, any statute, or any federal rule, that any Cooperation
3   Information or any evidence derived from any Cooperation Information
4   should be suppressed or is inadmissible; and (c) should the USAO
5   choose to pursue any charge that was either dismissed or not filed as
6   a result of this agreement, then (i) any applicable statute of
7   limitations will be tolled between the date of defendant's signing of
8   this agreement and the filing commencing any such action; and
9   (ii) defendant waives and gives up all defenses based on the statute
10  of limitations, any claim of pre-indictment delay, or any speedy
11  trial claim with respect to any such action, except to the extent
12  that such defenses existed as of the date of defendant's signing this
13  agreement.

14              EFFECTIVE DATE OF AGREEMENT

15      23.  This agreement is effective upon signature and execution of
16  all required certifications by defendant, defendant's counsel, and an
17  Assistant United States Attorney.

18              BREACH OF AGREEMENT

19      24.  Defendant agrees that if defendant, at any time after the
20  signature of this agreement and execution of all required
21  certifications by defendant, defendant's counsel, and an Assistant
22  United States Attorney, knowingly violates or fails to perform any of
23  defendant's obligations under this agreement ("a breach"), the USAO
24  may declare this agreement breached.  For example, if defendant
25  knowingly, in an interview, before a grand jury, or at trial, falsely
26  accuses another person of criminal conduct or falsely minimizes
27  defendant's own role, or the role of another, in criminal conduct,
28  defendant will have breached this agreement.  All of defendant's

                        15

1  obligations are material, a single breach of this agreement is
2  sufficient for the USAO to declare a breach, and defendant shall not
3  be deemed to have cured a breach without the express agreement of the
4  USAO in writing.  If the USAO declares this agreement breached, and
5  the Court finds such a breach to have occurred, then:

6       a.   If defendant has previously entered a guilty plea
7  pursuant to this agreement, defendant will not be able to withdraw
8  the guilty plea.

9       b.   The USAO will be relieved of all its obligations under
10  this agreement; in particular, the USAO: (i) will no longer be bound
11  by any agreements concerning sentencing and will be free to seek any
12  sentence up to the statutory maximum for the crime to which defendant
13  has pleaded guilty; (ii) will no longer be bound by any agreements
14  regarding criminal prosecution, and will be free to criminally
15  prosecute defendant for any crime, including charges that the USAO
16  would otherwise have been obligated not to criminally prosecute
17  pursuant to this agreement; and (iii) will no longer be bound by any
18  agreement regarding the use of Cooperation Information and will be
19  free to use any Cooperation Information in any way in any
20  investigation, criminal prosecution, or civil, administrative, or
21  regulatory action.

22       c.   The USAO will be free to criminally prosecute
23  defendant for false statement, obstruction of justice, and perjury
24  based on any knowingly false or misleading statement by defendant.

25       d.   In any investigation, criminal prosecution, or civil,
26  administrative, or regulatory action: (i) defendant will not assert,
27  and hereby waives and gives up, any claim that any Cooperation
28  Information was obtained in violation of the Fifth Amendment

16

1   privilege against compelled self-incrimination; and (ii) defendant
2   agrees that any Cooperation Information and any Plea Information, as
3   well as any evidence derived from any Cooperation Information or any
4   Plea Information, shall be admissible against defendant, and
5   defendant will not assert, and hereby waives and gives up, any claim
6   under the United States Constitution, any statute, Rule 410 of the
7   Federal Rules of Evidence, Rule 11(f) of the Federal Rules of
8   Criminal Procedure, or any other federal rule, that any Cooperation
9   Information, any Plea Information, or any evidence derived from any
10  Cooperation Information or any Plea Information should be suppressed
11  or is inadmissible.

12      25.  Following the Court's finding of a knowing breach of this
13  agreement by defendant, should the USAO choose to pursue any charge
14  or any civil, administrative, or regulatory action that was either
15  dismissed or not filed as a result of this agreement, then:

16          a.  Defendant agrees that any applicable statute of
17  limitations is tolled between the date of defendant's signing of this
18  agreement and the filing commencing any such action.

19          b.  Defendant waives and gives up all defenses based on
20  the statute of limitations, any claim of pre-indictment delay, or any
21  speedy trial claim with respect to any such action, except to the
22  extent that such defenses existed as of the date of defendant's
23  signing this agreement.

24          COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
25                          OFFICE NOT PARTIES

26      26.  Defendant understands that the Court and the United States
27  Probation and Pretrial Services Office are not parties to this
28  agreement and need not accept any of the USAO's sentencing

                                17

1 | recommendations or the parties' agreements to facts or sentencing
2 | factors.

3 |    27. Defendant understands that both defendant and the USAO are
4 | free to: (a) supplement the facts by supplying relevant information
5 | to the United States Probation and Pretrial Services Office and the
6 | Court, (b) correct any and all factual misstatements relating to the
7 | Court's Sentencing Guidelines calculations and determination of
8 | sentence, and (c) argue on appeal and collateral review that the
9 | Court's Sentencing Guidelines calculations and the sentence it
10 | chooses to impose are not error, although each party agrees to
11 | maintain its view that the sentencing calculations set forth above
12 | are consistent with the facts of this case. This paragraph permits
13 | both the USAO and defendant to submit full and complete factual
14 | information to the United States Probation Office and the Court, even
15 | if that factual information may be viewed as inconsistent with the
16 | Factual Basis or Sentencing Factors agreed to in this agreement.

17 |    28. Defendant understands that even if the Court ignores any
18 | sentencing recommendation, finds facts or reaches conclusions
19 | different from those agreed to, and/or imposes any sentence up to the
20 | maximum established by statute, defendant cannot, for that reason,
21 | withdraw defendant's guilty plea, and defendant will remain bound to
22 | fulfill all defendant's obligations under this agreement. Defendant
23 | understands that no one -- not the prosecutor, defendant's attorney,
24 | or the Court -- can make a binding prediction or promise regarding
25 | the sentence defendant will receive, except that it will be within
26 | the statutory maximum.

27 |

28 |

## NO ADDITIONAL AGREEMENTS

29. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

30. The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

NICOLA T. HANNA
United States Attorney

THOMAS F. RYBARCZYK                              March 26, 2020
Assistant United States Attorney                 Date

RICARDO PACHECO                                  3-16-2020
Defendant                                        Date

GLEN T. JONAS                                    3/16/20
Attorney for Defendant RICARDO                   Date
PACHECO

19

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

Ricardo Pacheco

RICARDO PACHECO
Defendant

3 - 10 - 2020
Date

20

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am RICARDO PACHECO's attorney. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

3/16/20
Date

GLEN T. JONAS
Attorney for Defendant RICARDO
PACHECO

21

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 666(a)(1)(B): Federal Program Bribery] |
| RICARDO PACHECO, | |
| Defendant. | |

The United States Attorney charges:

[18 U.S.C. § 666(a)(1)(B)]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

1.   The City of Baldwin Park, California (the "City") was a local government located within Los Angeles County in the Central District of California.   The City received in excess of $10,000 under federal programs for both 2017 and 2018.

2.   The City was governed, in part, by its City Council, which adopted legislation, set policy, adjudicated issues, and established the budget for the City.

3. The City Council was comprised of four City Council members and a Mayor, all of whom were elected at large by the City's registered voters.

4. Defendant RICARDO PACHECO was first elected to the City Council in 1997 and currently holds that elected position. He also previously served as the City's Mayor Pro-Tem. As a result of his position as councilman, defendant was an agent of the City.

5. Police Officer A was a City police officer and a member of the City's Police Association. The Police Association was the union representing the City's police officers and engaged in negotiations with the City Council and City administrators.

6. The City's contract with the City's Police Association was valued in excess of $5,000, namely, at least $4.4 million for a three-year period, and provided that the City would continue to employ the Police Association's members, namely, the unionized members of the City's Police Department, and provide for the creation of additional positions and pay increases for officers with certain education experience.

B. THE BRIBERY

7. Beginning in or about January 2018 and continuing to on or about October 17, 2018, in Los Angeles County, within the Central District of California, defendant PACHECO, an agent of the City of Baldwin Park, corruptly solicited, demanded, accepted, and agreed to accept things of value from Police Officer A, namely, $20,000 in cash and $17,900 in checks to a charity and political action committees over which defendant PACHECO exerted control, intending to be influenced and rewarded in connection with a business and a

///

1   transaction, and a series of transactions of the City of Baldwin
2   Park, having a value of $5,000 or more, specifically, the City's
3   contract with the City's Police Association.

1          FORFEITURE ALLEGATION

2     [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3     1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 18,

6  United States Code, Section 981(a)(1)(C) and Title 28, United States

7  Code, Section 2461(c), in the event of the defendant's conviction of

8  the offenses set forth in this Information.

9     2.   The defendant, if so convicted, shall forfeit to the United

10 States of America the following:

11         (a)   All right, title and interest in any and all property,

12 real or personal, constituting, or derived from, any proceeds

13 traceable to any such offense; and

14         (b)   To the extent such property is not available for

15 forfeiture, a sum of money equal to the total value of the property

16 described in subparagraph (a).

17 3.   Pursuant to Title 21, United States Code, Section 853(p), as

18 incorporated by Title 28, United States Code, Section 2461(c), the

19 defendant shall forfeit substitute property, up to the total value of

20 the property described in the preceding paragraph if, as the result

21 of any act or omission of the defendant, the property described in

22 the preceding paragraph, or any portion thereof: (a) cannot be

23 located upon the exercise of due diligence; (b) has been transferred,

24 sold to or deposited with a third party; (c) has been placed beyond

25 //

26 //

27

28

                              4

1  the jurisdiction of the court; (d) has been substantially diminished
2  in value; or (e) has been commingled with other property that cannot
3  be divided without difficulty.

4

5                                    A TRUE BILL

6

7
                                     _____
                                     Foreperson
8  NICOLA T. HANNA
   United States Attorney
9

10

11 BRANDON D. FOX
   Assistant United States Attorney
12 Chief, Criminal Division

13 MACK E. JENKINS
   Assistant United States Attorney
14 Chief, Public Corruption and
      Civil Rights Section
15
   DANIEL J. O'BRIEN
16 Assistant United States Attorney
   Deputy Chief, Public Corruption
17    and Civil Rights Section

18 THOMAS F. RYBARCZYK
   Assistant United States Attorney
19 Public Corruption and Civil
      Rights Section
20

21

22

23

24

25

26

27

28

# EXHIBIT B

## EXHIBIT B

### FACTUAL BASIS

The City of Baldwin Park, California (the "City") was a local government within Los Angeles County in the Central District of California. The City received in excess of $10,000 under federal programs for each of the calendar years 2017, 2018, and 2019.

The City was governed, in part, by its City Council, which adopted legislation, set policy, adjudicated issues, and established the budget of the City. The City Council was comprised of four City Council members and a Mayor, all of whom were elected by the City's voters.

The West Valley Water District (the "Water District") was a local government agency within San Bernardino County in the Central District of California. The Water District received in excess of $10,000 under federal programs for each of the calendar years 2017, 2018, and 2019.

The City's Police Association ("Police Association") was the union representing the City's police officers. The Police Association engaged in contract negotiations with the City Council and City administrators.

From 1997 to the present, defendant RICARDO PACHECO ("defendant") was a City Council member. From December 2017 through December 2018, defendant was the City's Mayor Pro-Tem. Defendant acted as an agent of the City in his capacity as a City Council member.

### The Police Association Scheme

Beginning in at least January 2018 and continuing through October 2018, defendant accepted $37,900 from Police Officer 1 ("PO-1"), a City police officer and Police Association member, in exchange for defendant's vote and support of the Police Association's contract with the City, a City contract valued in excess of $5,000. Specifically, the City's contract with the Police Association was valued at approximately $4.4 million over three years and called for the City to employ the Police Association's members, namely, the City Department's officers, and to provide for the creation of additional positions and pay raises for those officers with a certain level of education. In 2012, the City had considered disbanding its police department

1



and contracting directly with the Los Angeles County Sheriff's Department for police service for its City's residents.

In furtherance of this scheme, on January 24, 2018, defendant met with PO-1 in Baldwin Park and told PO-1 that he had several requests of the Police Association in exchange for his vote in favor of their contract. Defendant asked that the Police Association purchase tickets for two $1,000 tables for two different fundraisers at defendant's Catholic Church. Defendant also asked that the Police Association spend up to $75,000 for public service announcements that would demonstrate defendant's support for various causes, which were designed to assist defendant's political career.

On January 26, 2018, defendant met with PO-1 and another member of the Police Association in Baldwin Park. During the meeting, PO-1 provided defendant a $900 check made payable to the Catholic Church for one of the church's fundraisers. The memo line of the check read: "Donation for Ricardo Pacheco." Defendant indicated that he wanted $2,000 from the Police Association for the second fundraiser, which he said PO-1 could provide the following week. Defendant told PO-1 that the Police Association would need to continue to provide up to $1,000 to his hand-picked "non-profits" or Political Actions Committees ("PACs") per quarter and financially and publicly support defendant's re-election. PO-1 confirmed that defendant wanted $5,000 for public service announcements to assist defendant's political career by the following week.

On February 6, February 15, and February 28, 2018, at the direction of the Federal Bureau of Investigation ("FBI"), PO-1 met with and provided defendant with checks made payable to defendant's Catholic Church, as requested by defendant, totaling $7,000, in exchange for defendant's support for the Police Association contract.

After a March 7, 2018 City Council closed session, defendant sent a text message to PO-1 stating, "Contract was approved," in reference to the Police Association contract. At a March 21, 2018 City Council session open to the public, the City Council voted on the Police Association contract with defendant voting to approve the contract.

On August 29, 2018, defendant sent an email to PO-1 in which he asked the PO-1 and the Police Association to donate $5,000 to

2



defendant's wife's campaign for the Valley County Water District.

On September 4, 2018, defendant asked PO-1 for $5,000 from the Police Association for defendant's wife's political campaign and $25,000 for defendant's personal benefit, namely, the PACs defendant controlled. After PO-1 told defendant that the Police Association did not want to be seen as supporting any one candidate in particular, defendant told PO-1 they could get around this concern by having PO-1 make checks payable to defendant's hand-selected PACs. Six days later, on September 10, 2018, defendant sent a text message to PO-1 listing two PACs to which he wanted PO-1 to donate: the California Education Coalition PAC ("CEC") and California Fire and Safety Committee PAC ("CFSC"). While California Fair Political Practices Commission filings did not list defendant as controlling either PAC, as discussed more fully below, both CEC and CFSC existed to promote defendant's interests, including defendant's preferred political candidates and for defendant's own personal benefit. Further, defendant had personal relationships with both individuals who, according to the California Fair Political Practices Commission, ran the PACs and helped set up those PACs for those individuals.

On September 26, 2018, in furtherance of defendant's agreement with PO-1 to vote in favor of the Police Association's contract, PO-1 met with defendant in Baldwin Park and provided defendant two $5,000 checks from the Police Association payable to CEC and CFSC. Prior to providing the checks to defendant, PO-1 asked where the PACs would spend the money. Defendant said that they would "be used for, to promote me basically." After seeing that there were only two checks for $5,000 each inside the envelope provided by PO-1, defendant said: "I thought it was going to be more than that." PO-1 told defendant that PO-1 would attempt to get the remaining money soon.

On October 2, 2018, defendant and PO-1 spoke on the telephone. During the call, defendant questioned PO-1 as to why the Police Association had not honored their part in the agreement with defendant. In doing so, defendant reiterated he had already performed his part of the bargain by voting for the Police Association contract. Specifically, defendant said: "Look, here's my concern, is, you know, you guys asked me a while back to support the contract . . . you know, and I did. I went through my commitment. And now you guys are saying, well,

3

before you do your commitment, you're asking for more, right, commitment." Later, defendant said: "The point is that when we make a commitment, you complete it. And I got you to the goal, and you guys haven't committed to what you're saying you'd do and it's like you're saying, 'well we don't trust you so we're gonna not do our commitment at this point...'"

On October 17, 2018, PO-1 met with defendant in a Baldwin Park, California coffee shop and provided defendant with an envelope containing $20,000 in cash to fulfill the Police Association's part of the bargain with defendant in return for his vote on the Police Association contract. After exiting the coffee shop, defendant approached PO-1 in PO-1's vehicle and told PO-1 that he had to have checks, not cash. PO-1 responded by explaining that providing checks under defendant's short timeframe would be difficult and that cash was the most efficient way to provide the money defendant demanded. Defendant responded by saying if PO-1 had provided checks, defendant would have had to find a way to conceal the true source of the checks by depositing them in the PACs' accounts in order to obtain the money for defendant's personal use. When PO-1 asked if defendant wanted PO-1 to try and get checks from the Police Association, defendant said: "No no, just leave it like that," and PO-1 and defendant parted ways.

## Marijuana Distributorship Development Agreement Scheme[1]

Beginning in at least August 2017 and continuing through at least August 2018, defendant accepted from Political Consultant 1 ("PC-1") two $5,000 checks, one made payable to a PAC defendant designated and the second to defendant's wife's re-election campaign, in exchange for defendant's vote in support of an agreement valued well in excess of $220,000 annually awarding Marijuana Company 1 the City's sole marijuana distributorship.

More specifically, in approximately August 2017, defendant and Person 1, a public official, approached PC-1 and Marijuana Company 1 and solicited donations in the amount of $10,000 each for defendant's church, CEC, and for the campaign of Person 2, a public official, for board of the West Valley Water District ("Person 2's Campaign"). At the time, Marijuana Company 1 was seeking a development agreement from the City to be the sole distributor of marijuana in the City. Marijuana Company 1's

---

[1] Marijuana is also known and commonly referred to as cannabis.



4

owner, Person 3, provided a $10,000 check to CEC and a $10,000 check to Person 2's Campaign.

In November 2017, defendant met with PC-1 at a restaurant in Baldwin Park, California, and told PC-1 to ask Marijuana Company 1 for cash in exchange for defendant's vote. During the meeting and after some discussion, defendant told PC-1 that he should ask Marijuana Company 1 for at least $150,000, pay the 20% in taxes on the contract, and split the remainder with defendant in exchange for defendant's support of Marijuana Company 1's development agreement. PC-1 declined.

On December 18, 2017, the City Council voted on Marijuana Company 1's development agreement and approved Marijuana Company 1's development agreement by a vote of 3-0. Defendant and another councilmember did not attend or vote at the City Council meeting.

After the City Council indicated it would revisit the issue of Marijuana Company 1's development agreement, defendant and PC-1 met at a restaurant in Fontana, California on June 8, 2018. During the meeting, defendant told PC-1 he was raising money for three PACs: CEC, CFSC, and his wife's re-election committee. Defendant wrote the name of the three committees on a napkin, provided them to PC-1, and requested that Marijuana Company 1 make a total of $15,000 in donations, with each committee receiving a $5,000 donation.

On July 2, 2018, at the direction of the FBI, PC-1 met with defendant and defendant's friend Person 4, who defendant had previously identified as his "fundraising guy," at a restaurant in Rancho Cucamonga, California, to discuss the payments requested by defendant in exchange for his vote on Marijuana Company 1's agreement with the City. During the meeting, PC-1 told defendant that Marijuana Company 1 would provide $10,000 of the $15,000 requested by defendant to which defendant responded, "Ok, fine." PC-1 asked how defendant wanted the payments to be made, and defendant referred PC-1 to Person 4 and said Person 4 is "gonna do some fundraising for me." Later, during the meeting, defendant and Person 4 provided the names of the three PACs defendant previously identified, including CEC and CFSC, to which defendant wanted Marijuana Company 1 to provide donations in exchange for his political support of Marijuana Company One's Development Agreement.



5

On July 11, 2018, at the direction of the FBI, PC-1 met with Person 4 at a coffee house in West Covina. PC-1 provided Person 4 with a $5,000 check made payable to defendant's wife's re-election campaign and a $5,000 check made payable to CFSC.

On July 16, 2018, at the direction of the FBI, PC-1 met with defendant at a coffee house in West Covina, California, and later rode in defendant's vehicle. During the meeting, PC-1 told defendant that Marijuana Company 1 would be able to pay defendant another $5,000 by early August, to which defendant responded, "Ok, I trust you, brother." Defendant then told PC-1 "[Marijuana Company 1] should be good" for the upcoming vote. Later in the conversation, defendant asked PC-1, "So, like in August?" referring to the additional payment defendant expected Marijuana Company 1 to provide him. At the end of the conversation, PC-1 asked defendant if Marijuana Company 1 was good for [the vote on] Wednesday, to which defendant replied, "Yeah, brother, I'm there," confirming he would vote for Marijuana Company 1, and then "hopefully in the future they continue helping us in campaigns."

At a July 18, 2018 meeting, the City Council voted in favor of Marijuana Company 1's development agreement awarding it sole distributorship of marijuana in the City for 20 years. In accordance with his agreement with PC-1, defendant voted in favor of Marijuana Company 1's agreement with the City.

Defendant confirmed his vote to PC-1 through a text message on July 18, 2018. During the vote on July 18, 2018, defendant initially inadvertently voted no on the contract. When PC-1 texted him to ask what happened, defendant responded via text message with the following: "Sorry. They made motions that confused me. / On [Marijuana Company 1]. But i straight [sic] it out on correcting vote." The development agreement was approved by a 4-1 vote.

## West Valley Water District Board Scheme

Beginning in at least July 2017 and continuing through at least November 2019, defendant entered into agreement with Person 2, in which defendant would fund Person 2's Campaign for the Water District board and help him secure a contract with the City. In exchange, when Person 2 became a board member and an agent of the Water District, Person 2 would provide defendant a job at the Water District.

6



Defendant directed and/or arranged for Person 2's Campaign to receive approximately $20,500, which represented almost the entirety of $21,797 in monetary contributions received by Person 2's Campaign. These donations obtained by defendant came from individuals with business before the City. Defendant further arranged for Person 2's Campaign to receive $4,789.08 of in-kind contributions from CEC, the PAC defendant controlled. These in-kind donations were never disclosed by Person 2's election committee in an effort to conceal defendant's agreement with Person 2.

As the result of his appointment to the Water District, defendant received at least $300,000 in total salary from April 2018 through October 2019. In addition to this amount, defendant received approximately $142,194 in a severance package in November 2019.

More specifically regarding the origin of this agreement, in approximately July 2017, defendant and Person 2 had a conversation at Baldwin Park City Hall in which Person 2 told defendant he planned to run for West Valley Water District Board and needed defendant's help, which defendant understood to mean help fundraising for the campaign. During this conversation, Person 2 told defendant that the Water District had job openings and that if defendant helped Person 2 with his campaign, defendant would try to get him a job at the Water District. Specifically, Person 2 said that once he got elected to the Water District's Board, "we'll get you in." Person 2 and defendant also discussed how this position would assist defendant with maxing out his California state pension so that defendant would receive the most money possible in retirement. Defendant agreed to raise money for Person 2 in exchange for a position at the Water District.

Later, on a different date, Person 2 changed the terms of his deal with defendant and told defendant that he wanted their deal to include defendant's vote and support for the renewal of Person 2's contract with the City (collectively, with the agreement to raise funds for Person 2's campaign in exchange for a Water District job for defendant, the "Water District Agreement.").

In furtherance of the Water District Agreement, Person 2 involved Person 5, an elected official, to further the effort to obtain a job for defendant at the Water District. Person 5 told

7



defendant that if defendant helped Person 2 and Person 5 get elected, then Person 2 and Person 5 would "help" defendant.

As discussed above, defendant and Person 1 approached PC-1 and Marijuana Company 1 and solicited donations to Person 2's Campaign while Marijuana Company 1 was pursuing its agreement with the City for exclusive marijuana distribution rights. Marijuana Company 1's owner, Person 3, provided a $10,000 campaign contribution to Person 2's Campaign, which was reported to the California Fair Political Practices Commission as being received on September 14, 2017.

Marijuana Company 1's owner also provided a $10,000 check to CEC dated September 12, 2017. In furtherance of the Water District Agreement, defendant directed a $7,000 check from CEC's account payable to Person 2's campaign's account on or about September 26, 2017.

On October 9, 2017, Person 2 sent a text message to defendant's cellphone that stated: "Okay we are making our big push and I really need the 5k bro. Otherwise I'm completely broke this week and we are done," meaning that the success of Person 2's campaign depended on defendant's help with fundraising.

On October 10, 2017, in furtherance of defendant's agreement with Person 2, defendant solicited and arranged for a local developer, Person 6, to donate to Person 2's Campaign. On that same day, Person 6 donated $1,500. After doing so, defendant sent a text message to Person 2 on October 10, 2019 in which he wrote: "Check to see for money."

On October 19, 2017, at Person 2's request, defendant delivered four checks totaling $3,289.08 drawn on CEC's bank account to Person 7, Person 2's campaign manager. Of that amount, $2,699.94 was made payable to a printing company and $589.14 was made payable to the United States Postal Service. Later, in October 2017, defendant provided Person 2's Campaign two checks, dated October 28, 2017, totaling $1,500 drawn on CEC's bank account. Of that amount, $767.34 was made payable to a printing company and $732.66 was made payable to the United States Postal Service. Person 2's Campaign never reported these in-kind donations on its California Fair Political Practices Commission forms.

8



Defendant understood from Person 7 that the money paid by CEC to the printing company and United States Postal Service was in part to pay for a "hit piece," that is, a negative advertisement, against Person 2 and Person 5's opponents. The "hit piece" had been designed by Person 1 who himself was seeking to obtain a contract for legal services from the Water District.

In addition to these contributions, defendant solicited donations for Person 2's Campaign from Person 8, a business owner, and, in response, received two checks totaling $1,000 from Person 8. Defendant also solicited donations from Person 9, a business owner, and, in response, received a $1,000 check from Person 9.

On November 8, 2017, the day after the election, defendant sent the following text message to Person 2: "Assistant GM," which signified the Water District position defendant wanted in exchange for his help with Person 2's campaign. Approximately 30 minutes later, Person 2 responded: "Really? We will talk if my contract goes through." Approximately two minutes later, defendant sent the next two messages: "Because you can't afford me anyplace else. I make 180K plus benefits" and "Make a second AGM spot for more efficient program." Less than a minute later, Person 2 responded: "Working on it."

On November 9, 2017, Person 2 sent the following text message to defendant: "Okay we all just won we are in." In response, defendant asked: "Can we discuss the GM position."

On November 9, 2017 and November 10, 2017, defendant sought to pressure another City councilmember to vote in favor of renewing Person 2's contract with the City. The councilmember explained to defendant that she would not vote for the new contract proposal because it had materially changed from the one she had originally agreed to support. During a text message exchange, defendant wrote the following three messages within the same minute: (1) "I just need your support"; (2) "Plus he just won in a large water district"; and (3) "Think about the possibilities," by which defendant meant that the councilmember could obtain financial benefits from the Water District, herself, and Person 2 if the councilmember supported Person 2's contract renewal.

On November 15, 2017, in furtherance of the Water District Agreement, defendant voted in favor of renewing Person 2's



9

contract. The City Council voted to renew Person 2's contract by a 3-2 margin.

In December 2017, at the victory celebration for Person 2 and Person 5, Person 2 and Person 5 confirmed for defendant that they would make good on their promise of providing him a position at the Water District.

After becoming an agent of the Water District, Person 2 worked to create a new position of Assistant General Manager for the Water District and to hire defendant for that position pursuant to their Water District Agreement. On March 29, 2018, in accordance with the Water District Agreement, the Water District hired him as an Assistant Manager and shortly thereafter elevated and added additional responsibilities, which provided defendant an annual salary of $189,592 and the use of a Water District vehicle. The Board voted 4-0 in favor of defendant's contract with Person 2 abstaining, which was done in an effort to further conceal the Water District Agreement.

On December 13, 2018, FBI special agents executed a search warrant on defendant's residence and vehicle. Once the search had finished and on the same day, defendant met with Person 2 at a City event and told him about the FBI's search of his home.

Between March 2019 and April 30, 2019, defendant spoke with Person 2 and detailed evidence the FBI had gathered concerning the Police Association Scheme. Person 2 then provided defendant false exculpatory statements that Person 2 suggested defendant could tell the FBI, such as falsely stating that the cash he accepted from PO-1 were merely campaign contributions.

**Marijuana Cultivation and/or Manufacturing Development Scheme 1**

Beginning in 2017 and continuing through at least January 2019, defendant solicited approximately $150,000 from Person 10, a public official, in exchange for his vote and support for Marijuana Company 2's Cultivation and/or Manufacturing Development Agreement ("Cultivation Development Agreement") with the City, an agreement worth in excess of $240,000 annually. Defendant received at least $100,000 in payments from Person 10 in connection with this agreement.

More specifically, prior to August 2017, Person 1 approached defendant and told defendant that the City should agree to allow marijuana companies to operate within the City's boundaries. Person 1 explained that defendant could personally profit from

10

allowing such businesses to operate within the City by accepting payments from applicants through an intermediary, which defendant could then either directly accept or direct to future campaigns. Person 1 explained that defendant should find an individual he trusted who would not talk (the "intermediary"), instruct the intermediary to represent himself as a "consultant" to companies seeking Cultivation Development Agreements, and promise to deliver a development agreement to the company in exchange for $150,000 fee. Person 1 explained that consultants had been charging $150,000 to assist with licensing related to marijuana, which is why defendant should ask for that amount. The intermediary then would share this $150,000 fee with defendant who would then work with Person 1 and others on the City Council to get the Cultivation Development Agreements approved for that applicant.

In approximately August 2017, defendant met with Person 10 in Los Angeles County and accepted three $10,000 checks from Person 10's consulting company ("Consulting Company 1"). After losing one $10,000 check, defendant directed his friend, Person 11, to deposit the checks. Person 11 then withdrew approximately $12,000 in cash and provided it to defendant. Prior to accepting the payment from Person 10, defendant and Person 10 agreed that Person 10 would provide defendant payments in exchange for his vote in support of Marijuana Company 2's Cultivation Development Agreement.

During the scheme, Person 1, Person 10, and defendant met on approximately five occasions at downtown Los Angeles restaurants, typically a month before the City Council voted on Cultivation Development Agreements. During these meetings, defendant and Person 10 would discuss in front of Person 1 the payments Person 10 made to defendant for his vote, and Person 1 and defendant would update Person 10 on the status of other Cultivation Development Agreement applications.

In approximately November 2017, at defendant's request and in exchange for his vote and support for Marijuana Company 2, Person 10 wrote a $2,500 check drawn on Consulting Company 1's account for defendant's spouse's political campaign.

On April 18, 2018, in accordance with his agreement with Person 10, defendant voted in favor of Marijuana Company 2's development agreement for marijuana cultivation and manufacturing in its first reading before the City Council. Each development agreement before the City Council required a

first and second reading with at least one reading needing to occur at a regularly scheduled City Council meeting. After the first reading, a majority of the City Council would need to vote in favor of the development agreement in order for it to proceed to a second reading. After the second reading, a majority of the City Council would need to vote in favor of the agreement in order for it to become law.

On July 18, 2018, in accordance with his agreement with Person 10, defendant voted in favor of Marijuana Company 2's development agreement for marijuana cultivation and manufacturing in its second reading.

In approximately September 2018, defendant and Person 10 met in person in Los Angeles County. In exchange for his vote and support for Marijuana Company 2, Person 10 provided defendant a $50,000 check with a blank payee drawn on the account of Person 12, an individual affiliated with Marijuana Company 2. Defendant then provided the $50,000 check to Person 13, one of defendant's friends and a City and Water District contractor, who deposited the check into Person 13's company's account on or about September 21, 2018. Person 13 later provided defendant with approximately $15,000 of the $50,000 deposit in cash over several meetings in order to conceal the nature of the transaction.

On December 5, 2018, in accordance with his agreement with Person 10 and after Marijuana Company 2 petitioned to change its location, defendant voted in favor of Marijuana Company 2's amended development agreement for marijuana cultivation and manufacturing in its first reading.

As discussed above, on December 13, 2018, FBI special agents executed a federal search warrant on defendant's residence and vehicle. After the FBI had completed its search and left the premises, defendant contacted Person 1. At the time, defendant knew that Person 1 was close to Person 10 and believed that Person 1 and Person 10 had an agreement with respect to marijuana licensing in the City. Person 1 also told defendant that he was in business with Person 10, and Person 1 and Person 10 were seeking a marijuana license in Commerce, California.

On December 19, 2018, in accordance with his agreement with Person 10, defendant voted in favor of Marijuana Company 2's development amended agreement for marijuana cultivation and manufacturing in its second reading.



12

On or about January 24, 2019, Person 10 provided defendant seven checks totaling $20,000 from individuals who defendant had never met. At least four of these individuals had connections to Marijuana Company 2. Defendant had asked Person 10 for donations to his legal fund after he and Person 10 had entered into an agreement whereby Person 10 would provide tens thousands of dollars to defendant in exchange for defendant's vote in favor of Marijuana Company 2. Defendant never formed a legal defense fund and instead used the money for his personal gain, namely, paying for legal bills for an unrelated civil matter.

**Marijuana Cultivation and/or Manufacturing Development Scheme 2**

Beginning in at least June 2017 and continuing through at least December 2018, defendant entered into an agreement with Person 4, defendant's "fundraising guy," in which Person 4 would solicit "consulting" contracts from Marijuana Companies 3 and 4, both of whom were seeking City marijuana cultivation and manufacturing development agreements. The development agreement for Marijuana Company 3 was worth well in excess of $220,000, and the development agreement for Marijuana Company 4 was worth well in excess of $198,000. Defendant and Person 4 agreed that Person 4 would charge Marijuana Companies 3 and 4 $150,000 each in consulting fees, which would be paid to Person 4's company, Consulting Company 2. Of the $150,000, defendant would receive 60 percent of those fees and Person 4 would receive 40 percent of the fees. Person 4 would withdraw cash from his Consulting Company 2 account and provide defendant his payments in cash in order to conceal the transactions. In exchange, defendant would vote for and support Marijuana Companies 3 and 4's City development agreements.

At some point in 2017, after this conversation, Person 1 provided defendant a physical copy of sample "consultant agreement" that Person 1 told defendant he could have his intermediary use when approaching companies seeking Cultivation Development Agreements. At the bottom of the sample agreement, it said to call Person 1 for any questions. Defendant provided that agreement to Person 4 who, as discussed later, served as defendant's intermediary with two companies seeking marijuana cultivation and/or manufacturing development agreements.

Between approximately August 2017 and December 2018, Person 4 received approximately $110,500 from Marijuana Company 3 and $45,000 from Marijuana Company 4. In that same time period, defendant accepted at least $93,300 in cash from Person 4 as



13

part of his agreement to vote and support the development agreements for Companies 3 and 4.

Person 4 would often provide the cash that was subject to this agreement to defendant in person. For example, on October 6, 2017, Person 4 sent a text message using his cellphone to defendant's cellphone in which Person 4 wrote: "I printed the remainder of the documents you requested." Person 4 used "documents" as coded language for cash in order to conceal their agreement. Person 4 then sent another message to defendant's cellphone in which he wrote: "Let me know if you could meet tonight. OK." Approximately five minutes later, defendant responded to Person 4 with a text message that read "7pm tonight." Several hours later, defendant sent a text message to Person 4 in which defendant wrote: "Check the printing on the docs. Last time the printing was too light." When defendant said the "printing was too light" on the "docs," defendant was using coded language to conceal their agreement and to explain that Person 4 had not provided enough cash during their previous meeting. Less than 20 minutes later, Person 4 responded to defendant with this text message: "Haha...this time it's full color ink," confirming the payment amount was larger than the last and consistent with their agreement.

Similarly, Person 4 allowed defendant on at least one occasion to pick up cash from Person 4's home. On July 13, 2018, Person 4 sent a text message to defendant in which Person 4 wrote: "Call me a (sic) soon as you can so we can work out a way for you to pick up the documents [cash] this morning." Later, Person 4 wrote to defendant the following message: "I am not able to get away this morning, however you're welcome to stop by at your convenience and pick up [cash] from my house."

During the scheme, defendant and Person 4 would discuss the status of Company 3's development agreement in the City Council. For example, during October 2017, November 2017, and December 2017, Person 4 sent text messages to defendant referring to the phrase "city of Chinos," which was their code to refer to Company 3 and/or its representatives, around the dates of Baldwin Park City Council meetings and asked for updates from defendant on the application of the "City of Chinos," which defendant provided on at least two occasions.

On April 18 and May 2, 2018, in accordance with his agreement with Person 4, defendant voted in favor of Marijuana Company 3 and 4's development agreement applications, and the City Council



14

advanced and/or approved both Marijuana Company 3 and Company 4's development agreement applications on those dates.



# EXHIBIT C



